# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 04/03/2020 05:23 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk

Case 2:20-cv-03887-JAK-KS Document 1-1 Filed 04/28/20 Page 2 of 105 Page ID #:8

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Gabriel G. Green, Esq. (SBN 222445)  Gordon C. Stuart, Esq. (SBN 294321)  BUCHALTER, APC  1000 Wilshire Boulevard, Suite 1500  Los Angeles, CA  90017 | |

TELEPHONE NO.: (213) 891-0700   FAX NO.: (213) 896-0400

ATTORNEY FOR *(Name):* Plantiff, PACIFIC COLLECTIVE, LLC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **LOS ANGELES**
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: (same)
CITY AND ZIP CODE: Los Angeles, CA  90012
BRANCH NAME: Central (Stanley Mosk)

CASE NAME: PACIFIC COLLECTIVE, LLC v. EXXONMOBIL OIL CORPORATION

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☒ **Unlimited**  (Amount  demanded  exceeds $25,000) | ☐ **Limited**  (Amount  demanded is  $25,000 or less) | ☐ **Counter**  ☐ **Joinder**  Filed with first appearance by defendant  (Cal. Rules of Court, rule 3.402) | 20STCV13294  JUDGE:  DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☒ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ☒ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* 3 (1-Breach of Written Contract; 2-Special Performance; 3-Declaratory Relief)
5. This case ☐ is  ☒ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: April 3, 2020

Gabriel G. Green
(TYPE OR PRINT NAME)    ▶    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use  Judicial Council of California  CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;  Cal. Standards of Judicial Administration, std. 3.10  *www.courtinfo.ca.gov* |

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36) Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

American LegalNet, Inc.
www.FormsWorkflow.com

| SHORT TITLE: | CASE NUMBER |
|---|---|
| PACIFIC COLLECTIVE, LLC v. EXXONMOBIL OIL CORPORATION | |

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death - Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

**10**



American LegalNet, Inc.
www.FormsWorkFlow.com

| SHORT TITLE: | CASE NUMBER |
|---|---|
| PACIFIC COLLECTIVE, LLC v. EXXONMOBIL OIL CORPORATION | |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation      Number of parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032 Quiet Title | 2, 6 |
| | | ☒ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**



American LegalNet, Inc.
www.FormsWorkFlow.com

| SHORT TITLE: PACIFIC COLLECTIVE, LLC v. EXXONMOBIL OIL CORPORATION | CASE NUMBER |
| --- | --- |

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
| --- | --- | --- | --- |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160 Abstract of Judgment | 2, 6 |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123 Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190 Election Contest | 2 |
| | | ☐ A6110 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4


American LegalNet, Inc.
www.FormsWorkFlow.com

| SHORT TITLE: | CASE NUMBER |
|---|---|
| PACIFIC COLLECTIVE, LLC v. EXXONMOBIL OIL CORPORATION | |

**Step 4:** **Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| **REASON:** | ADDRESS: |
|---|---|
| ☐ 1. ☒ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | 3800 Sepulveda Boulevard |

| CITY: | STATE: | ZIP CODE: | |
|---|---|---|---|
| Culver City | CA | 90230 | |

**Step 5:** **Certification of Assignment:** I certify that this case is properly filed in the Central - Stanley Mosk District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: April 3, 2020

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

**13**

American LegalNet, Inc.
www.FormsWorkFlow.com

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
EXXONMOBIL OIL CORPORATION,  a New York Corporation, formerly known as Mobile Oil Corporation; and DOES 1-100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PACIFIC COLLECTIVE, LLC, a Delaware Limited Liability Company

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>LOS ANGELES SUPERIOR COURT, CENTRAL DISTRICT<br>Stanley Mosk Courthouse<br>111 North Hill Street<br>Los Angeles, CA  90012 | CASE NUMBER:<br>*(Número del Caso):*<br>20STCV13294 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gabriel G. Green, Esq. (SBN 222445) Gordon C. Stuart, Esq. (SBN 294321)    (213) 891-0700
BUCHALTER, APC
1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA  90017

Sherri R. Carter Executive Officer / Clerk of Court

| DATE:<br>*(Fecha)* 04/03/2020 | Clerk, by<br>*(Secretario)* C. Monroe | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465<br>*www.courtinfo.ca.gov* |
|---|---|---|---|

Electronically FILED by Superior Court of California, County of Los Angeles on 04/03/2020 05:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk

Case 2:20-cv-03887-JAK-KS   Document 1-1   Filed 04/28/20   Page 9 of 105   Page ID #:15
20STCV13294

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Terry Green

BUCHALTER
A Professional Corporation
GABRIEL G. GREEN (SBN: 222445)
GORDON C. STUART (SBN 294321)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: 213.891.0700
Fax: 213.896.0400
Email: ggreen@buchalter.com; gstuart@buchalter.com

Attorneys for plaintiff PACIFIC COLLECTIVE, LLC, a Delaware
Limited Liability Company

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| PACIFIC COLLECTIVE, LLC, a Delaware Limited Liability Company;<br><br>Plaintiff,<br><br>vs.<br><br>EXXONMOBIL OIL CORPORATION, a New York Corporation, formerly known as Mobile Oil Corporation; and DOES 1-100, inclusive,<br><br>Defendants. | Case No.: 20STCV13294<br>**Assigned to:**<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **BREACH OF WRITTEN CONTRACT;**<br>2. **SPECIAL PERFORMANCE; and**<br>3. **DECLARATORY RELIEF, WITH REQUEST FOR TEMPORARY PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF.**<br><br>**DEMAND FOR JURY TRIAL** |

**COMES NOW** Plaintiff PACIFIC COLLECTIVE, LLC, a Delaware Limited Liability Company ("Plaintiff"), against Defendants EXXONMOBIL OIL CORPORATION, a New York Corporation, formerly known as Mobil Oil Corporation ("Defendant"), and DOES 1 – 100, inclusive.

## SUMMARY OF ACTION

1.      In March 2020, citizens of the State of California were facing an unprecedented global pandemic known as COVID-19, which brought with it the deaths of thousands of Americans, and prompted City, County, and State officials to execute orders and directives for all persons residing in California to stay at home for an indefinite period.  The orders, which were all directed at preserving and protecting the safety of human life, rendered it impossible for Plaintiff to perform the acts of closing under a land purchase agreement entered with Defendant.  Said orders and directives also made it impossible for Plaintiff to redevelop the real property upon closing, which redevelopment Defendant acknowledged was Plaintiff's intended use.  Despite the global pandemic and the City, County, and State Orders, Defendant, in material breach of the agreement, rejected Plaintiff's rightful invocation of the force majeure clause in their agreement to merely extend the closing date, as expressly provided for in their agreement, while the force majeure persisted.  Making matters worse, Defendant also attempted to unilaterally terminate the transaction in further material breach of their agreement, all because Plaintiff was unwilling to violate law and jeopardize human life.

2.      By way of this Complaint, Plaintiff seeks to hold Defendant accountable for its unexcused and callous breach of the land purchase agreement, which results in Plaintiff suffering monetary damages of no less than $7,950,000.  Plaintiff also seeks a judgment compelling Defendant to perform under the terms of the land purchase agreement by transferring the unique property to Plaintiff in exchange for the bargained-for purchase price of $4.2 million.

## THE PARTIES

3.      Plaintiff PACIFIC COLLECTIVE, LLC is a Delaware Limited Liability Company that is duly registered to conduct business in the State of California and which is doing business in the County of Los Angeles, State of California.

**COMPLAINT FOR DAMAGES**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 40116724v3

4.     Plaintiff is informed and believes and thereon alleges that Defendant EXXONMOBIL OIL CORPORATION is a New York Corporation formerly known as Mobile Oil Corporation, which is and was at all relevant times, conducting business in the County of Los Angeles, State of California.

5.     Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 100 and, therefore, sues these Defendants by such fictitious names.  Plaintiff will amend this Complaint pursuant to Code of Civil Procedure Section 474 to allege the true names and capacities of these Defendants when ascertained.  Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants DOES 1 through 100, inclusive, have caused and participated in each of the acts and omissions of each of the named Defendants herein alleged, and in doing so, acted as the agent, employee, and/or co-conspirator of said Defendants, and acted within the scope and in furtherance of said agency, employment, or conspiracy.

6.     At all times mentioned herein, Defendants, including Defendant EXXONMOBIL OIL CORPORATION, and each of them, were the agents, servants and employees of the remaining Defendants, and of each other and that at all times mentioned herein, Defendants and each of them were acting with the knowledge of each other and within the course and scope of their agency or employment, as applicable.

**<u>JURISDICTION AND VENUE</u>**

7.     Jurisdiction in this Court is proper because each of the causes of action set forth in this Complaint arises under California law, because the amount of damages in controversy is within the jurisdiction of the Superior Court, because the contract was entered in the County of Los Angeles, because Defendant is conducting business in the County of Los Angeles, and because this action concerns the right to possesses and occupy real property situated in the County of Los Angeles.

8.     Venue is proper is Los Angeles County under California Code of Civil Procedure sections 393, 395, and 395.5 because: (i) one or more of the acts, omissions, breaches, and wrongs giving rise to the causes of action asserted herein occurred or were to be performed in Los

Angeles County; (ii) on information and belief, Defendant EXXONMOBIL OIL CORPORATION is conducting business in the County of Los Angeles; and (iii) this action concerns the right to possesses and occupy real property situated in the County of Los Angeles.

## **GENERAL ALLEGATIONS**

9.     In or about late 2019 and early 2020, Plaintiff, as the Purchaser, and Defendant, as the Seller, entered into an agreement entitled "SALE AND PURCHASE AGREEMENT (FORMER MOBIL SERVICE STATION, CULVER CITY, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA" (the "Purchase Agreement").  The Purchase Agreement was signed by Plaintiff on November 5, 2019, but it was not signed by Defendant until February 3, 2020, with the latter date becoming the "Effective Date" of the Purchase Agreement.  A true and correct copy of the Purchase Agreement is marked and attached hereto as "**Exhibit 1**."

10.     During the negotiation process leading up to the Purchase Agreement, and thereafter, Defendant was repeatedly made aware that it was Plaintiff's intention to immediately redevelop the Property for a use other than its current use.  Defendant had actual knowledge that Plaintiff intended to imminently develop the Property, and Defendant was provided with Plaintiff's plans for redevelopment (the "Redevelopment Plans"), which Defendant acknowledged in Article 10, subdivision (c)(iv) of the Purchase Agreement.

11.     Having provided Defendant with actual knowledge of Plaintiff's plans to redevelop the Property, Defendant was aware that upon Closing, Plaintiff's use of the Property would include imminently utilizing construction crews, architects, inspectors, planners, and other persons necessary to accomplish the purposes for which Plaintiff was purchasing the Property.

12.     Pursuant to the Purchase Agreement, Plaintiff agreed to purchase from Defendant that certain parcel of land located in Culver City, County of Los Angeles, State of California, with an address of 3800 Sepulveda Boulevard, Culver City, California, together will all improvements, fixtures, and personal property situated on or under the real property (the "Property"), for the total purchase price of four million two hundred thousand dollars ($4,200,000.00) (the "Total Purchase Price").  The Property is more specifically described as:

That portion of Lot 15 as shown on map of the 120.71 acre tract, belonging to the Estate of Pedro Talamantes, deceased, in he Rancho La Ballona, in the City of Culver City, County of Los Angeles, State of California, filed in Case NO. 7078 of the Superior Court, described below as follows:

Beginning at the Point of Intersection of the Southwesterly line of said Lot 15, with the Southeasterly line of the thirty (30) foot strip conveyed to the County of Los Angeles by deed recorded in Book 4224, Page 208 of Deeds, Records of said county; thence South 33∘13' Eat along said Southwesterly line, a distance of One Hundred Thirty (130) feet; Thence North 55∘48'30" East, parallel with the Southeasterly line of the Thirty (30) foot strip conveyed to said County of Los Angeles by deed hereinbefore referred to, a distance of One Hundred Fifty (150) feet; Thence North 33∘13' West parallel with the Southwesterly line of said Lot 15, a distance of One Hundred Thirty (130) feet to a point in the Southwesterly line of said Lot 15, a distance of One Hundred Thirty (130) feet to a point in the Southwesterly line of said Thirty (30) foot strip; Thence South 55∘48'30" West along said Southwesterly line One Hundred Fifty (150) feet to the Point of Beginning.

Excepting therefrom the Southwesterly Fifty (50) feet thereof included within the line of Sepulveda Boulevard.

13.     The Purchase Agreement included provisions for payment of a nonrefundable, earnest money deposit of $50,000.00 (the "Option Deposit"), followed by an additional deposit in escrow of $70,000.00 (the "Earnest Money") due and payable within three (3) days after the "Effective Date." After the Effective Date, Plaintiff had a period of ninety (90) days to inspect the Property (the "Inspection Period").

14.     Upon the expiration of the ninety (90) day Inspection Period, and all other contingencies and conditions being satisfied, the transaction would close (the "Closing"). At Closing, Plaintiff would be obligated to present its agent along with evidence "reasonably satisfactory to [Defendant] and the Title Company that the person executing the documents on behalf of [Plaintiff] has the full power and authority to do so." Under the terms of the Purchase Agreement, and with respect to Closing, Plaintiff would also have to present its agent before a notary public to have the documents necessary for Closing notarized. Plaintiff would also become obligated to the tender remaining balance due on the $4.2 million Total Purchase Price.

15.     Section 38 to the Purchase Agreement, entitled "**FORCE MAJEURE**," provides as follows:

The deadline for performance of any obligation of a party hereunder shall be automatically extended one day such performance is delayed on account of

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 40116724v3

force majeure, which as used herein means acts of God, strikes, lockouts, sit-downs, material or labor restrictions by any governmental authority, civil riot, floods, wash-outs, explosions, earthquakes, fires, storms, acts of the public enemy, acts of terrorism, wars, insurrections, defaults by the other party and any other cause not reasonably within the control of the party who performance is delayed by force majeure and which, by the exercise of due diligence, the claiming party is unable, wholly or in part, to prevent or overcome.

16.    After Plaintiff signed the Purchase Agreement on November 5, 2019, Plaintiff and Defendant negotiated over certain terms, such that Defendant did not sign the Purchase Agreement until February 3, 2020.  The delay between Plaintiff and Defendant signing the Purchase Agreement was consistent with Defendant's behavior throughout the entire negotiation process, whereby Defendant often delayed for months on end by failing to respond to correspondence or due to "personnel changes" within Defendant.

17.    Due to the delay between Plaintiff and Defendant signing the Purchase Agreement, and for other good and legitimate reasons, Plaintiff and Defendant entered into a First Amendment of Sale and Purchase Agreement (the "Amendment") dated February 7, 2020.   A true and correct copy of the Amendment is marked and attached hereto as "**Exhibit 2**."

18.    Pursuant to the Amendment, Plaintiff and Defendant agreed that Plaintiff was not obligated to pay into escrow the $70,000.00 Earnest Money payment until February 7, 2020, that Plaintiff waived its ninety (90) day period to inspect the Property after the Effective Date, and that Closing would be set for March 31, 2020, at which time Plaintiff would be obligated to remit the balance owing to the $4.2 million Total Purchase Price, and Defendant would be obligated to execute all necessary documents to transfer good title to the Property to Plaintiff.

## COVID-19 INTERNATIONAL PANDEMIC – FORCE MAJEURE EXCUSES PLAINTIFF'S PERFORMANCE

19.    Beginning in or about December 2019, an international pandemic of unprecedented scale spread across the globe, whereby inhabitants of all nations were affected by the virus referred to as "COVID-19, "which was a lethal and highly contagious virus that affected all people, and particularly the elderly and immunocompromised.

20.     As data relating to the transmission and lethality of COVID-19 became more readily available, the consensus in both the scientific and political spheres was that reduced interaction in and amongst people was the surest safeguard to preventing the disease from spreading.

21.     On March 4, 2020, California Governor Gavin Newsom ("Governor Newsom") proclaimed a state of emergency to exist in California as a result of the threat of COVID-19.

22.     On March 11, 2020, the World Health Organization announced that the outbreak of COVID-19 was properly characterized as a pandemic.

23.     On March 13, 2020, United States President Donald J. Trump declared a national emergency recognizing the threat that the novel COVID-19 virus posed to the United States' national security.

24.     On March 18, 2020, United States President Donald J. Trump executed an executive order prioritizing and allocating health and medical resources to respond to the spread of COVID-19.

25.     On March 19, 2020, City of Los Angeles Mayor Eric Garcetti ("Mayor Garcetti") issued an executive order which, among other things, ordered "all persons living within the City of Los Angeles . . . to remain in their homes."  (Referred to herein as the "LA Stay-at-Home Order.") The LA Stay-at-Home Order further ordered that "all business within the City of Los Angeles are ordered to cease operations that require in-person attendance by workers at a workplace . . ."   The LA Stay-at-Home Order was made effective until April 19, 2020.

26.     March 19, 2020, i.e., 12 days before the March 31, 2020, Closing date, Governor Newsom executed Executive Order N-33-20 (the "California Stay-at-Home Order"), which, among other things, ordered "all individuals living in the State of California to stay at home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors . . ." [Emphasis added.]   The California Stay-at-Home Order provided that a "[v]iolation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.  (California Health and Safety Code 120295 et seq.)"  The California Stay-at-Home order was made effective through April 19, 2020.

**COMPLAINT FOR DAMAGES**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 40116724v3

27.     On March 20, 2020, the City of Culver City issued a "Safer at Home" Order stopping all non-essential activities outside of residences in response to COVID-19 (the "Culver City Safer-at-Home Order").  Pursuant to the Culver City Safer-at-Home Order, all residents of the City of Culver City were called upon to stay in their residences and to limit all activities outside of their homes beyond what was absolutely necessary for essential tasks.  The "Safer at Home" Order further specified that to the extent residents were required to leave their homes for necessary tasks, they were instructed to stay at least six (6) feet away from others.

28.     On March 21, 2020, the County of Los Angeles issued a Revised Order to comply with the California Stay-at-Home Order (the "County of LA Stay-at-Home Order"), which was also made effective through April 19, 2020.  Pursuant to the County of LA Stay-at-Home Order:

> Effective immediately on March 21, 2020 and continuing through April 19, 2020, all public and private group events and gatherings are prohibited anywhere within the Los Angeles County Public Health Jurisdiction.  All persons are to remain in their homes or at their place of residence, except to travel to and from Essential Businesses, to work at or provide service to a Healthcare Operation or Essential Infrastructure, to engage in Essential Activities, or to participate in an individual or family outdoor activity, while practicing social distancing.

29.     The County of LA Stay-at-Home Order, like the California Stay-at-Home Order, provided that "[v]iolation or failure to comply with this Order is a crime punishment by fine, imprisonment, or both.  (California Health and Safety Code § 120295; Los Angeles County Code § 11.02.080.)"

30.     As a result of the aforementioned events, including, but not limited to, the California Stay-at-Home Order, the County of LA Stay-at-Home Order, the LA Stay-at-Home Order, and the Culver City Safer-at-Home Order, it became not reasonably feasible and logistically impractical for Closing to proceed on March 31, 2020.  Indeed, it became illegal for Plaintiff to direct its agent to present himself or herself in person to execute the documents on behalf of Plaintiff as required by Section 4 of the Purchase Agreement, and it also became illegal for Plaintiff to direct its agent to go out in public to a notary public to have the documents necessary for closing notarized.

31.     Additionally, it became commercially unfeasible, impractical, and illegal for Plaintiff to use the Property for its stated and acknowledge purposes upon Closing, i.e., its redevelopment.  Under the force majeure conditions, including the several Stay-at-Home Orders, Plaintiff could not immediately bring in construction workers, architects, inspectors, and other persons necessary to redevelop the Property for its intended use.  Not only would doing so pose a danger to human life, it would subject Plaintiff and those involved to criminal prosecution.

32.     In addition to the above-referenced acts, the force majeure made it impractical and unfeasible to accomplish other events necessary and attendant to Closing.  The force majeure resulting from the COVID-19 pandemic and the recent Orders from the various governmental bodies required the delay of the Closing while the force majeure remained.

33.     On March 30, 2020, Plaintiff, by and through her attorneys, sent a letter by electronic mail to Defendant and its counsel to provide formal notice that the COVID-19 pandemic, as well as the California Stay-at-Home Order, the County of LA Stay-at-Home Order, the LA Stay-at-Home Order, and the Culver City Safer-at-Home Order, constituted a force majeure that prevented Plaintiff from meeting its obligations under the Purchase Agreement by the date of Closing (the "Notice of Force Majeure Leter").  A true and correct copy of the March 30, 2020, letter is marked and attached hereto as "**Exhibit 3**."  The correspondence further stated:

> While our client fully intends to proceed with its purchase of the Property, the aforementioned orders and restrictions inhibit our client's ability to close escrow while the governmental orders and restrictions remain in force.  The "Safer at Home" orders will be in effect until at least April 19, 2020, a minimum of thirty-one days, unless further extended.  Unfortunately, the "Safer at Home" orders are expected to remain in effect for an unknown additional period of time.
>
> Because [Plaintiff] is unable to proceed with the Closing while the "Safer at Home" orders remain in effect, we are hereby providing notice on behalf of Buyer that, pursuant to Section 38 of the Agreement, Buyer extends the Closing one day for each day any applicable "Safer at Home" order remains in effect.  Accordingly, as of the date of this letter, the Closing can occur no sooner than May 1, 2020.

34.     On March 31, 2020, after the close of business, Defendant, by and through its attorneys, responded to Plaintiff' Force Majeure Letter, in which Defendant conceded that

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 40116724v3

1   Plaintiff's business was not an "Essential Business" as defined by the operative orders.   A true

2   and correct copy of the March 31, 2020, letter is marked and attached hereto as "**Exhibit 4**."

3   Defendant also effectively conceded that there was in fact an event constituting a force majeure.

4          35.     Defendant's concessions notwithstanding, Defendant purported to reject Plaintiff's

5   notification that Plaintiff was unable and excused from performing under the Purchase Agreement

6   due to the undeniable force majeure in effect.   Defendant, through its counsel, further indicated

7   that if Plaintiff "**cannot** close on the transaction as provided in the [Amendment], [Defendant]

8   will terminate the Agreement as it is right pursuant to the agreement."

9          36.     Plaintiff's counsel responded to Defendant's counsel after-hours March 31, 2020

10  letter, with a letter reaffirming Plaintiff's exercise of its rights under the Purchase Agreement to

11  extend the Closing due to the force majeure and invited a discussion among counsel to attempt to

12  work through the issues created by the force majeure.   A true and correct copy of Plaintiff's

13  counsel's April 2, 2020 letter is attached hereto as "**Exhibit 5**."

14         37.     On April 3, 2020, Defendant, by and through its attorneys, transmitted a letter by

15  electronic mail to Plaintiff's counsel, which stated: "This Notice serves as Seller's termination of

16  the Agreement pursuant to Section 16 of the Agreement.  Purchaser failed to meet the obligations

17  of the Agreement and close the transaction on March 31, 2020.  Therefore, as is Seller's right

18  under the Agreement, it is terminating the Agreement and retaining the Earnest Money."  A true

19  and correct copy of the April 3, 2020, letter is marked and attached hereto as "**Exhibit 6**."

20         38.     Defendant's termination notice is invalid and in breach of the Purchase

21  Agreement.  Plaintiff is not yet obligated to close on the transaction because the Closing has been

22  delayed on account of the on-going force majeure resulting from the COVID-19 outbreak and the

23  various governmental Orders as identified herein.

24         39.     The Purchase Agreement alleged herein contains an attorney's fees provision that

25  provides that if either party institutes an action or proceeding against the other arising out of or

26  relating to the terms and conditions of the Purchase Agreement, the non-prevailing party to such

27  action or proceeding will reimburse the prevailing party therein for its reasonable expenses and

28  attorney's fees.  The Purchase Agreement also contains a venue clause, by which Plaintiff and

Defendant agreed and consented to the exclusive venue and jurisdiction of any federal or state court sitting in the County of Los Angeles, State of California, for any action arising out of or in any way related to the Purchase Agreement.

**FIRST CAUSE OF ACTION**

**BREACH OF WRITTEN CONTRACT**

**(By Plaintiff, PACIFIC COLLECTIVE, LLC, and against Defendants, EXXON MOBIL CORPORATION, formerly known as Exxon Oil Corporation, and DOES 1-100)**

40.     Plaintiff incorporates the above allegations in paragraphs 1 through 39 and incorporates them as though set forth fully herein.

41.     On February 3, 2020, Plaintiff and Defendant entered the Purchase Agreement, which was subsequently amended on February 7, 2020, pursuant to the Amendment.  Under the Purchase Agreement, it provides in section 38, entitled **FORCE MAJEURE**, that the "deadline for performance of any obligation of a party hereunder *shall be automatically* extended" in the event of a force majeure.

42.     In light of the global pandemic of COVID-19, as well as the California Stay-at-Home Order, the County of LA Stay-at-Home Order, the LA Stay-at-Home Order, the Culver City Safer-at-Home Order, and the threat of criminal violation of said Orders, Plaintiff notified that Defendant in writing that Closing pursuant to the Purchase Agreement could not go forward on March 31, 2020, due to the undeniable force majeure.  In response to Plaintiff's notification, Defendant responded in writing by indicating that if Plaintiff did not perform the acts required at Closing by March 31, 2020, it would terminate the Purchase Agreement.

43.     Plaintiff, having provided due notice, did not perform the acts of Closing on March 31, 2020, and Defendant purported to terminate the Purchase Agreement.  Defendant then advised that it would retain all $120,000.00 of Plaintiff's Option Deposit and Earnest Money, and Defendant refused to proceed under the Purchase Agreement.

44.     By its acts and omissions, Defendant is in breach of the Purchase Agreement and Amendment.

45.     Plaintiff performed all of its obligations and covenants under the Purchase Agreement and Amendment, except for those obligations and covenants for which performance was excused.

46.     Defendant has materially breached the Purchase Agreement.

47.     As a direct and proximate result of Defendants' breach of the Purchase Agreement and Amendment, Plaintiffs suffered damages.

48.     Defendant's breach of the Purchase Agreement and Amendment was a substantial factor in causing Plaintiffs' damages.

49.     Plaintiff is entitled to an award of compensatory damages including, but not limited to, a sum of no less than $7,950,000, as well as costs of suit and attorney's fees incurred herein.

## SECOND CAUSE OF ACTION

### SPECIFIC PERFORMANCE

**(By Plaintiff, PACIFIC COLLECTIVE, LLC, and against Defendants, EXXON MOBIL CORPORATION, formerly known as Exxon Oil Corporation, and DOES 1-100)**

50.     Plaintiff incorporates the above allegations in paragraphs 1 through 49 and incorporates them as though set forth fully herein.

51.     Plaintiff and Defendant entered a specifically enforceable contract that is sufficiently certain in its terms; namely, Plaintiff and Defendant entered the Purchase Agreement and Amendment by which Plaintiff agreed to purchase Defendant's Property for the total sum of $4.2 million, and that parties specifically agreed that each other's performance was excused in the event of force majeure for each day that the force majeure prevented performance.

52.     Plaintiff and Defendant both provided adequate consideration under the Purchase Agreement and Amendment.

53.     Plaintiff has performed all of its obligations and covenants under the Purchase Agreement and Amendment, other than those obligations and covenants that are excused by force majeure, and Plaintiff has notified Defendant that once the force majeure ends, Plaintiff will perform its remaining obligations.

54.     Defendant has breached the Purchase Agreement and Amendment by indicating it will terminate the Purchase Agreement if Plaintiff will not perform the acts required at closing, including acts that would qualify as crimes under the current California and County of LA Stay-at-Home Orders.

55.     Plaintiff has no adequate remedy at law as the Property that is the subject of the Purchase Agreement and Amendment is unique.  (See, e.g., *Abadjian v. Superior Court* (1985) 168 Cal.App.3d 363, 374.)

56.     Plaintiff prays the court order and adjudge that Defendant must specifically perform under the Purchase Agreement by transferring the Property to Plaintiff once the force majeure ends and Closing may occur.

## THIRD CAUSE OF ACTION

### DECLARATORY RELIEF, WITH REQUEST FOR TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

**(By Plaintiff, PACIFIC COLLECTIVE, LLC, and against Defendants, EXXON MOBIL CORPORATION, formerly known as Exxon Oil Corporation, and DOES 1-100)**

57.     Plaintiff incorporates the above allegations in paragraphs 1 through 56 and incorporates them as though set forth fully herein.

58.     Plaintiff is informed and believes and thereon alleges that an actual controversy exists between Plaintiff and Defendant relative to the Purchase Agreement and Amendment.

59.     Plaintiff prays that the Court adjudicate the rights, interests, duties, and obligations of Plaintiff and Defendant under the Purchase Agreement and Amendment, and Plaintiff specifically prays that the Court determine that Plaintiff was excused from performance under the Purchase Agreement while such performance was rendered impossible and, or in the alternative, impractical due to the force majeure, and that the Purchase Agreement remained in full force and effect and binding upon the parties pending resolution of the force majeure.

60.     In conjunction therewith, Plaintiff requests that this Court issue temporary, preliminary and permanent injunctive relief, which prohibits Defendants from taking any action to transfer right, title, interest, or possession to the Property during the pendency of these

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 40116724v3

13
**COMPLAINT FOR DAMAGES**

proceedings, including but not limited to hypothecating, encumbering, transferring, selling, or otherwise dissipating the Property.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

## PRAYER FOR RELIEF

a. For general and special damages in the amount of at least $7,950,000;

b. For the issuance of temporary, preliminary and permanent injunctive relief, which prohibits Defendants from taking any action to transfer right, title, interest, or possession to the Property during the pendency of these proceedings, including but not limited to hypothecating, encumbering, transferring, selling, or otherwise dissipating the Property.

c. For an order awarding Plaintiffs their costs and attorneys' fees incurred in this action;

d. For on order compelling Defendant to specifically perform under the Purchase Agreement and Amendment;

e. For a declaration of Plaintiff's and Defendant's respective rights, duties, interests, and obligations; and

f. For such other and further relief as the Court may deem proper.

DATED:  April 3, 2020                          BUCHALTER
                                                A Professional Corporation


                                        By: _____
                                                GABRIEL G. GREEN
                                                GORDON C. STUART
                                            Attorneys for Plaintiff PACIFIC COLLECTIVE,
                                            LLC, a Delaware Limited Liability Company

# EXHIBIT 1

# EXHIBIT 1

NCS-873236-A

## SALE AND PURCHASE AGREEMENT
### [FORMER MOBIL SERVICE STATION, CULVER CITY, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA]

This SALE AND PURCHASE AGREEMENT ("Agreement") is made as of the Effective Date (as defined below in the last paragraph of this Agreement) by and between **EXXONMOBIL OIL CORPORATION, a New York corporation, formerly known as Mobil Oil Corporation** ("Seller"), duly authorized to do business in the State of California, and **PC VENICE AND SEPULVEDA LLC**, a Delaware limited liability company, duly authorized to do business in the State of California ("Purchaser"), upon the following terms and conditions:

1.     **PROPERTY.**

Seller will sell and convey, and Purchaser will purchase and pay for the surface estate of that certain tract or parcel of land located in Culver City, county of Los Angeles, state of California, with an address of 3800 Sepulveda Boulevard, Culver City, California, being more particularly described on **Exhibit "A"** attached hereto (the "Land"), together with all improvements, fixtures and personal property, if any, located on or under the Land (collectively, the "Property"). Seller reserves the right to revise the legal description attached as Exhibit "A" upon receipt of a Survey (as defined below) acceptable to Seller and the Title Commitment (as defined below), provided, however, such revision may only be to reflect the actual legal description of the Property intended to be sold and conveyed hereby.

2.     **PURCHASE PRICE.**

The total purchase price for the Property is Four Million Two Hundred Thousand and 00/100 Dollars ($4,200,000.00) ("Culver City Purchase Price").

3.     **EARNEST MONEY/DEPOSIT.**

A.     As of September 28, 2018, pursuant to the Limited Option to Purchase between Seller and Purchaser, dated September 24, 2018, Purchaser deposited with the Title Company (as defined below) the amount $50,000.00 ("Option Deposit"), which is nonrefundable, but will be applied towards the Purchase Price at Closing.

B.     Within three (3) business days after the Effective Date, Purchaser will deposit with the Title Company (as defined below) an earnest money deposit in the amount of Seventy Thousand and 00/100 Dollars ($70,000.00) ("Earnest Money"). Earnest Money will be held by the Title Company in an interest-bearing account reasonably acceptable to both Purchaser and Seller, subject to Purchaser's compliance with the Title Company's requirements for investment of funds. Interest, if any, earned on the Earnest Money deposit will become part of the Earnest Money. The Earnest Money will be disposed of by the Title Company pursuant to this Agreement.

Page 1 of 43

4.    **CLOSING.**

The closing of the transaction contemplated herein will be held at the offices of the Title Company, at the time and date agreed upon by Seller and Purchaser, but Closing must occur within thirty (30) days after the earlier of (1) issuance of the NFA Letter (as defined below); or (2) expiration of the Review Period (as defined below), unless Seller and Purchaser mutually agree in writing otherwise (the "Closing"). However, notwithstanding the above, Closing will occur no later than November 18, 2019. The date of the Closing as determined is the "Closing Date."

A.    Seller's Deliverables.  At Closing, Seller, at Seller's sole cost and expense, will deliver or cause to be delivered to Purchaser and the Title Company the following:

(1)    A duly executed and acknowledged Grant Deed/Environmental Restrictions in the form and substance attached hereto as **Exhibit "B"** (the "Deed") subject to those matters set forth in the Deed and in this Agreement.

(2)    A Non-Foreign Affidavit substantially in the form of **Exhibit "C"** attached hereto.

(3)    Such affidavits and certificates as the Title Company may reasonably require, including certificates necessary to delete standard title insurance exceptions and to protect Purchaser against claims that may give rise to any mechanic's, material man's or other liens against the Property arising by, through or under Seller.

(4)    A duly executed final closing statement as provided by the Title Company.

(5)    Evidence reasonably satisfactory to Purchaser and the Title Company that the person executing documents on behalf of Seller has the full power and authority to do so.

(6)    Such other instruments as are customarily executed in the state and county in which the Property is situated to effectuate the conveyance of the Property.

B.    Purchaser's Deliverables.  At Closing, Purchaser, at Purchaser's sole cost and expense, will deliver or cause to be delivered to Seller and the Title Company the following:

(1)    Certified funds or United States bank cashier's check made payable in United States dollars to the Title Company or funds delivered by federal funds wire transfer to the Title Company in the amount of the Purchase Price, due credit being given for the Earnest Money and other adjustments and prorations as provided herein.

(2)     The Deed duly executed and acknowledged by Purchaser.

(3)     A duly executed final closing statement as provided by the Title Company.

(4)     Evidence reasonably satisfactory to Seller and the Title Company that the person executing documents on behalf of Purchaser has the full power and authority to do so.

(5)     Such other instruments as are customarily executed in the state and county in which the Property is situated to effectuate the conveyance of the Property.

C.     <u>Conditions Precedent to Closing.</u>  Seller and Purchaser have entered into a Letter Agreement for the sale and purchase of certain property located in Akron, Summit County, Ohio, attached hereto as Exhibit "E" ("Akron Transaction").  The Parties agree closing on the Akron Transaction is a condition precedent to Closing on this Agreement.

D.     <u>Prorations and Adjustments</u>.   In accordance with Section 12, current real estate taxes, assessments and charges will be prorated as of the Closing Date for the tax year of the applicable taxing authority, without regard to when said taxes are payable, so that the portion of current taxes allocable to the period from the beginning of such tax year to the Closing Date will be the responsibility of Seller, and the portion of the current taxes allocable to the period from and including the Closing Date to the end of such tax year will be the responsibility of Purchaser.

E.     <u>Closing Costs</u>.   Closing costs will be apportioned and paid as follows:

Seller will pay the cost of i) the Owner's Title Policy (as defined below), except Purchaser will pay for (A) any endorsements not required for Seller to deliver title in the condition required under this Agreement and (B) the lender's policy of title insurance, ii) the cost of any title examination fees, iii) the cost for bringing forward the title abstract, iv) one-half the escrow fee charged by the Title Company, v) the cost of the Survey, vi) Seller's attorneys' fees, and vii) recordation and transfer taxes imposed by the county and by the city, if any, in connection with the recordation of the Deed (including without limitation any documentary transfer tax) and viii) all costs of recording the instruments to release all liens to be released at Closing and to cure title objections that Seller has agreed or is obligated pursuant to the terms hereof to cure. Purchaser will pay the costs of i) recording all instruments other than those to be recorded at Seller's expense, ii) all recording charges payable in connection with the recording of the Deed, iii) one-half the escrow fee charged by the Title Company, iv) all costs for title endorsements not the responsibility of Seller, v) the lender's policy of title insurance, and vi) Purchaser's attorneys' fees.

F.     Possession of the Property will be delivered to Purchaser at Closing and funding of the transaction contemplated herein.

**5.    CONVEYANCE AND TITLE INSURANCE.**

Conveyance will be by the Deed, and Seller will furnish Purchaser at Seller's expense an Owner's Policy of Title Insurance, insuring good and indefeasible fee simple title to the Property in the standard form promulgated by the applicable state insurance authority, issued by First American Title Company, Attn: Ms. Sharon Mork, whose address is 1790 Hughes Landing Boulevard, Suite 110, The Woodlands, Texas 77380 (the "Title Company"), and in the amount of the Purchase Price (the "Owner's Title Policy"), subject to no exceptions or reservations other than the following:

A.    Standard Exceptions.    The customary and standard printed exceptions contained in the form of title policy promulgated by the California State Board of Insurance, including the standard exception regarding discrepancies, conflicts or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.    This exception may be amended at Purchaser's expense.

B.    Permitted Encumbrances.    The Permitted Encumbrances (as defined below) as set forth in Section 6 below.

C.    Taxes and Special Assessments.    Ad valorem taxes and special assessments, if any, against the Property for the current year are prorated between Seller and Purchaser as of the Closing Date, as set forth in Sections 4.C. and 11.  Seller shall be liable for payment of all such taxes and assessments for all prior years.  From and after the Closing Date Purchaser will pay all such ad valorem and special assessments, as well as any subsequent assessments for prior years due to a change in ownership or change in land usage.

D.    Survey.    Any and all other matters as shown on the Survey (as defined below) or as would be shown on a current, accurate survey of the Property.

E.    Matters in the Deed.    All other restrictions, reservations, notices, consents, covenants, exceptions and other matters stated in the Deed.

**6.    PERMITTED ENCUMBRANCES, TITLE COMMITMENT, AND TITLE EXAMINATION.**

At Seller's cost, Seller will furnish within three (3) days from the Effective Date to Purchaser and the surveyor a current Commitment for Title Insurance issued by the Title Company, setting forth the state of title of the Property and all defects, objections and exceptions which the Title Company determines are of record or which may appear on the Survey or prior survey of the Property, if any, including easements, licenses, exceptions, conditions, reservations, rights-of-way, restrictions, covenants, and other encumbrances, if any, affecting the Property, along with copies of the documents that constitute the title exceptions (the "Title Commitment").    Upon Purchaser's receipt of the Survey, the Title Commitment and copies of the instruments

affecting title, Purchaser will have thirty (30) days within which to review such documents and advise Seller in writing of Purchaser's objections to title or other objections to the Property (the "<u>Objections</u>"). Objections that Purchaser waives or to which Purchaser does not object within the 30-day period will be deemed approved by Purchaser (the "<u>Permitted Encumbrances</u>"). If Purchaser notifies Seller of any Objections, Seller shall, within ten (10) days from the date Seller receives Purchaser's notice of Objections, give written notice to Purchaser whether or not Seller will cure the Objections. If Seller fails to give such notice, Seller shall be deemed to have elected not to cure such Objections. If Seller elects to cure the Objections, Seller shall complete such cure prior to Closing. If, for any reason, Seller does not timely commit to cure or remove the Objections to the satisfaction of the Title Company and Purchaser, then Purchaser may, within the next twenty (20) days, as Purchaser's **sole and exclusive remedy**, either i) terminate this Agreement by notifying Seller of the termination, whereupon the Earnest Money will be returned to Purchaser, and the parties will be fully and **finally released from all further obligations and liabilities** under this Agreement, except as otherwise provided in this Agreement, or ii) waive the uncured Objections and close the transaction contemplated by this Agreement in accordance with its remaining terms and conditions, whereupon the Objections, or part thereof, waived will become Permitted Encumbrances, to be treated in the manner provided in this Agreement for Permitted Encumbrances. If Purchaser does not exercise its right to terminate under this section within the stated time period, Purchaser will be deemed to have **waived** its right to terminate this Agreement on the basis of Objections and to have elected to have **waived** the uncured Objections.

7.   **SURVEY.**

At Seller's expense, Seller furnished to Purchaser and the Title Company, prior the Effective Date, a certified on-the-ground staked plat of survey of the Property (the "<u>Survey</u>"), dated November 16, 2017 prepared by a land surveyor selected by Seller and who is duly licensed in the State of California and satisfactory to the Title Company and the Purchaser. The Survey conforms to the current standards set out by the American Land Title Association (ALTA) classified as Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys.

8.   **MUTUAL RELEASE AND PURCHASER'S ASSUMPTION OF RESPONSIBILITY.**

A.   IF THE CLOSING OCCURS, EXCEPT FOR THOSE OBLIGATIONS OF SELLER SET FORTH IN THIS AGREEMENT, PURCHASER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, I) AGREES AND **COVENANTS NOT TO SUE** SELLER RELATED PARTIES (AS DEFINED BELOW) FOR ANY AND ALL CLAIMS (AS DEFINED BELOW), AND II) AGREES TO **ACQUIT, RELEASE AND FOREVER DISCHARGE** SELLER RELATED PARTIES FROM ANY AND ALL CLAIMS, IN BOTH CASES, THAT ARISE OUT OF OR RELATE TO, IN ANY WAY, THE CONDITION, OWNERSHIP, USE, MAINTENANCE OR OPERATION OF THE PROPERTY AT ANY TIME, WHETHER BEFORE, ON OR AFTER THE CLOSING DATE, NO MATTER HOW OR WHEN CAUSED, WHETHER KNOWN OR UNKNOWN,

THAT ARE ASSERTED OR MADE BY ANY PERSON OR ENTITY, WHETHER PUBLIC OR PRIVATE, UNDER ANY LAW, EXCEPT TO THE EXTENT ANY CLAIM ARISES OUT OF OR RELATES TO SELLER'S NEGLIGENCE OR WILLFUL MISCONDUCT. AS USED HEREIN, THE TERM "LAW" MEANS ANY STATUTE, LAW, RULE, REGULATION OR ORDINANCE, WHETHER FEDERAL, STATE OR LOCAL, WHETHER AT LAW OR EQUITY, WHETHER BY STATUTE, COMMON LAW, ADMINISTRATIVE OR REGULATORY PROCEEDING OR OTHERWISE, WHETHER BASED ON THE NEGLIGENCE, STRICT LIABILITY, OR OTHER CONDUCT OF ANY PARTY HERETO OR OTHERWISE, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, THE CLEAN AIR ACT, THE SAFE DRINKING WATER ACT, AND THE CLEAN WATER ACT, OR SIMILAR OR COUNTERPART STATE STATUTES. AS USED HEREIN, THE TERM "CLAIMS" MEANS ANY AND ALL LOSSES, DAMAGES, CLAIMS, DEMANDS, LIABILITIES, SUITS, CAUSES OF ACTION, CROSS-CLAIMS OR COUNTERCLAIMS; ANY AND ALL RIGHTS OF CONTRIBUTION, SUBROGATION, INDEMNITY OR REIMBURSEMENT; ANY AND ALL LIENS, PAYMENTS, PENALTIES OR FINES (CIVIL OR CRIMINAL) OR TAXES; AND ANY AND ALL EXPENSES, COSTS OR FEES, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, ATTORNEYS' AND EXPERT WITNESS FEES AND COURT COSTS, AND ANY OTHER CHARGES OF ANY KIND OR NATURE WHATSOEVER. THE TERM "SELLER RELATED PARTIES" INCLUDES SELLER, ITS PARENT, AFFILIATES, SUBSIDIARIES, EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS AND ALL THEIR RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS. **PURCHASER WAIVES ALL RIGHTS OR BENEFITS WHICH IT NOW HAS OR IN THE FUTURE MAY HAVE UNDER THE TERMS OF SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH READS:**

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

B.   IF THE CLOSING OCCURS, EXCEPT FOR THOSE OBLIGATIONS OF PURCHASER SET FORTH IN THIS AGREEMENT, SELLER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, I)  AGREES AND **COVENANTS NOT TO SUE** PURCHASER RELATED PARTIES (AS DEFINED BELOW) FOR ANY AND ALL CLAIMS (AS DEFINED BELOW), AND II) AGREES TO **ACQUIT, RELEASE AND FOREVER DISCHARGE** PURCHASER RELATED PARTIES FROM ANY AND ALL CLAIMS, IN BOTH CASES, THAT ARISE OUT OF OR RELATE TO, IN ANY WAY, THE CONDITION, OWNERSHIP, USE, MAINTENANCE OR OPERATION OF THE PROPERTY AT ANY TIME, WHETHER BEFORE, ON OR AFTER THE CLOSING DATE, NO MATTER HOW OR WHEN CAUSED, WHETHER KNOWN OR UNKNOWN, THAT ARE ASSERTED OR MADE BY ANY PERSON OR ENTITY, WHETHER PUBLIC OR PRIVATE, UNDER ANY LAW, EXCEPT TO THE EXTENT ANY CLAIM

ARISES OUT OF OR RELATES TO PURCHASER'S NEGLIGENCE OR WILLFUL MISCONDUCT. AS USED HEREIN, THE TERM "LAW" MEANS ANY STATUTE, LAW, RULE, REGULATION OR ORDINANCE, WHETHER FEDERAL, STATE OR LOCAL, WHETHER AT LAW OR EQUITY, WHETHER BY STATUTE, COMMON LAW, ADMINISTRATIVE OR REGULATORY PROCEEDING OR OTHERWISE, WHETHER BASED ON THE NEGLIGENCE, STRICT LIABILITY, OR OTHER CONDUCT OF ANY PARTY HERETO OR OTHERWISE, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, THE CLEAN AIR ACT, THE SAFE DRINKING WATER ACT, AND THE CLEAN WATER ACT, OR SIMILAR OR COUNTERPART STATE STATUTES. AS USED HEREIN, THE TERM "CLAIMS" MEANS ANY AND ALL LOSSES, DAMAGES, CLAIMS, DEMANDS, LIABILITIES, SUITS, CAUSES OF ACTION, CROSS-CLAIMS OR COUNTERCLAIMS; ANY AND ALL RIGHTS OF CONTRIBUTION, SUBROGATION, INDEMNITY OR REIMBURSEMENT; ANY AND ALL LIENS, PAYMENTS, PENALTIES OR FINES (CIVIL OR CRIMINAL) OR TAXES; AND ANY AND ALL EXPENSES, COSTS OR FEES, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, ATTORNEYS' AND EXPERT WITNESS FEES AND COURT COSTS, AND ANY OTHER CHARGES OF ANY KIND OR NATURE WHATSOEVER. THE TERM "PURCHASER RELATED PARTIES" INCLUDES PURCHASER, ITS PARENT, AFFILIATES, SUBSIDIARIES, EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS AND ALL THEIR RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS. **SELLER WAIVES ALL RIGHTS OR BENEFITS WHICH IT NOW HAS OR IN THE FUTURE MAY HAVE UNDER THE TERMS OF SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH READS:**

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

C. IF THE CLOSING OCCURS, EXCEPT FOR THE OBLIGATIONS OF SELLER UNDER THIS AGREEMENT, PURCHASER, FOR ITSELF AND ITS SUCCESSORS AND **ASSIGNS, ASSUMES, UNDERTAKES AND ACCEPTS ANY AND ALL RESPONSIBILITIES, OBLIGATIONS, RISKS AND LIABILITIES,** IF ANY, FOR I) THE ENVIRONMENTAL AND/OR PHYSICAL CONDITION OF THE PROPERTY, WHETHER EXISTING, CREATED OR SET IN PLACE BEFORE, ON OR AFTER THE CLOSING DATE, WHETHER KNOWN OR UNKNOWN, NO MATTER HOW OR WHEN CAUSED, WHETHER BASED ON PAST, PRESENT OR FUTURE CONDITIONS, OPERATIONS, ACTIVITIES OR EVENTS, ARISING UNDER OR RELATED TO ANY LAW, AND II) THE ASSESSMENT, REMEDIATION, REMOVAL, TRANSPORTATION, DISPOSAL, TREATMENT OR OTHER DISPOSITION OF ANY AND ALL WASTES, MATERIALS AND SUBSTANCES IN, ON OR UNDER THE PROPERTY OR WHICH ARE RELATED TO OR ARISING FROM THE PROPERTY AT

ANY TIME, WHETHER HAZARDOUS OR NOT, THAT IS OR MAY BE REQUIRED UNDER ANY LAW.

    D.   THE TERMS AND CONDITIONS OF THIS SECTION 8 WILL SURVIVE THE CLOSING.

    9.    **CONDITION OF PROPERTY.**

    A.   PURCHASER ACKNOWLEDGES THAT (1) THE PROPERTY HAS BEEN USED AS AN AUTOMOBILE SERVICE STATION FOR THE STORAGE, SALE, TRANSFER AND DISTRIBUTION OF MOTOR VEHICLE FUEL, PETROLEUM PRODUCTS AND/OR DERIVATIVES CONTAINING HYDROCARBONS AND THAT SUCH FUEL, PETROLEUM PRODUCTS AND/OR DERIVATIVES AND/OR OTHER RELATED HAZARDOUS MATERIALS MAY HAVE BEEN SPILLED, LEAKED OR OTHERWISE DISCHARGED ONTO, INTO OR UNDER THE PROPERTY CAUSING CONTAMINATION TO THE SOIL AND/OR GROUNDWATER ON, IN OR UNDER THE PROPERTY; AND (2) THE AUTOMOBILE SERVICE STATION WAS CLOSED, DEMOLISHED AND UNDERGROUND STORAGE TANKS REMOVED IN APPROXIMATELY 2000; (3) SELLER IS CURRENTLY CONDUCTING REMEDIATION ACTIVITIES ON THE PROPERTY PURSUANT TO THE OVERSIGHT OF THE REGIONAL WATER QUALITY CONTROL BOARD ("RWQCB") AND THE CITY OF SANTA MONICA ("CITY"); AND (4) SELLER IS IN THE PROCESS OF SEEKING REMEDIATION CASE CLOSURE FROM THE RWQCB AND THE CITY.

    B.   EXCEPT FOR THE EXPRESS LIMITED REPRESENTATIONS AND WARRANTIES, IF ANY, SET FORTH HEREIN AND IN THE DEED (COLLECTIVELY, THE "SELLER'S LIMITED REPRESENTATIONS AND WARRANTIES"), PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO i) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, GEOLOGY, AND ENVIRONMENTAL CONDITION OF THE PROPERTY, ii) THE INCOME THAT MAY BE DERIVED FROM THE PROPERTY, iii) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL DEVELOPMENT, CONSTRUCTION, ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, iv) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION (WHETHER EXISTING OR CONTEMPLATED) WITH ANY LAW, v) THE HABITABILITY, MERCHANTABILITY OR FITNESS OF THE PROPERTY FOR ANY PARTICULAR PURPOSE, vi) ANY COSTS OR FEES REQUIRED TO EXTEND, TIE, OR TAP INTO ANY UTILITIES SERVING THE PROPERTY OR TO OTHERWISE DEVELOP THE PROPERTY, OR vii) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER HAS BEEN OR WILL BE GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY AND THAT  PURCHASER IS RELYING OR WILL RELY SOLELY

ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER OR ANY AGENT OR EMPLOYEE OF SELLER OR ON ANY REPRESENTATION, WARRANTY, PROMISE, COVENANT, AGREEMENT OR GUARANTEE FROM SELLER (NONE OF WHICH HAVE BEEN GIVEN EXCEPT AS EXPRESSLY PROVIDED ABOVE) OR ANY AGENT OR PURPORTED AGENT OF SELLER.   PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY AND ALL INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES, AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.   PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS-IS, WHERE-IS" AND "WITH ALL FAULTS" BASIS AND CONDITION SUBJECT ONLY TO SELLER'S LIMITED REPRESENTATIONS AND WARRANTIES, IF ANY.

      10.    REMEDIATION AND NO FURTHER ACTION REQUIREMENTS.

      A.    Purchaser acknowledges that, as disclosed in Section 9 above, Seller is conducting certain monitoring, characterization and remediation activities on the Property (collectively, the "Remediation Activities").   Seller agrees to keep Purchaser reasonably informed of progress of the Remediation Activities and progress towards obtaining a "No Further Action" letter from the RWQCB and any other applicable agencies ("NFA").

      B.    Notwithstanding anything to the contrary in this Agreement, Seller shall expeditiously perform all Remediation Activities necessary to obtain the NFA, at Seller's sole cost and expense, and shall obtain the NFA.  Seller will use commercially reasonably efforts to obtain the NFA prior to Closing.  However, Purchaser and Seller agree that receipt of the NFA is not a condition precedent to Closing.  Seller and Purchaser agree that the NFA will not include any deed restrictions, engineering controls or other use limitations other than restrictions on residential use, ground water extraction for potable purposes and a passive vapor barrier under the foundation of any building.

      C.    If Seller does not obtain an NFA prior to Closing, Seller and Purchaser agree to the following:

      i.    Seller agrees that it will conduct the Remediation Activities in such a manner so as to not unreasonably interfere with redevelopment activities or occupancy of the Property by the Purchaser. Purchaser agrees to allow Seller reasonable access to the Property, at no cost, to conduct remediation activities.

      ii.    Seller will continue to control the manner and methodology of the remediation of the Property, provided it is a form of active remediation or other remediation approved by the RWQCB, and will continue to lead communications with

the RWQCB regarding the Remediation Activities and obtaining NFA.   Purchaser agrees that it will not initiate contact or communicate with the RWQCB regarding the Remediation Activities by Seller; provided, however, Purchaser may discuss redevelopment-related issues with the RWQCB.  Seller shall give Purchaser written progress reports regarding the Remediation Activities and obtaining the NFA at least once each month and shall give Purchaser copies of all correspondence and other documents prepared or received by on or behalf of Seller in connection with the Remediation Activities and obtaining the NFA.

iii.      Seller shall be listed as the generator of all wastes caused by or originating from any Remediation Activities including, without limitation, any contaminated soil, sediment, groundwater, surface water, piping, buried structures or other substance or materials that Seller or any of Seller's Representatives encounter, excavate, dredge or remove.   Seller must sign all manifests for transportation and disposal of any such wastes without reference to Purchaser or any of its affiliated companies on the manifests.  Copies of all such manifests must be provided to the Purchaser. Within twenty (20) days of completing any phase of Remediation Activities, Seller must remove from the Property all such wastes generated by Seller's activities and properly dispose of such wastes at an appropriately licensed solid waste disposal facility.   Seller and Seller's Representatives must ensure waste materials are properly contained and managed until they are properly disposed of.

iv.      Purchaser has provided Seller with its redevelopment plans, attached hereto as **Exhibit "D"**.  Seller agrees to remove or relocate such wells and below ground infrastructure identified above as reasonably requiring removal or relocation due to Purchaser's redevelopment, at Seller's sole cost and expense. Purchaser acknowledges and agrees that the RWQCB's approval may be required for any monitoring well or subsurface infrastructure removal. In the event Purchaser's redevelopment plans change in the future, Purchaser and Seller agree to cooperate in good faith to determine whether any existing monitoring wells and below ground infrastructure reasonably require removal or relocation prior to redevelopment of the Property; however, Seller will not be responsible for the costs associated with such removal or relocation.

v.      Seller agrees to provide Purchaser with a copy of the NFA promptly after receipt.

D.      Post-NFA Well Abandonment. Parties agree to cooperate in good faith regarding well abandonment.

i.      Seller will propose a well abandonment plan to RWQCB in accordance with the NFA and procure all necessary permits in a manner consistent with Purchaser's redevelopment plans.

ii.      Seller will promptly abandon all wells and other subsurface infrastructure according to regulation and RWQCB requirements, at Seller's sole cost and expense.

iii.     Seller will provide Purchaser with copies of all correspondence with RWQCB relating to well abandonment.

iv.     Purchaser agrees to provide Seller reasonable access, at no cost, to the Property for the purposes of well abandonment activities.

## 11.   REVIEW PERIOD.

A.   <u>Purchaser's Inspection Rights</u>.  For a period of ninety (90) days after the Effective Date (the "<u>Review Period</u>"), Purchaser, and Purchaser's employees, contractors, agents and representatives (collectively "<u>Purchaser's Representatives</u>") at Purchaser's sole risk, cost and expense, may enter the Property to generally inspect and survey the Property and to conduct non-invasive tests and studies including a Phase I environmental assessment of the Property, if desired by Purchaser.  If the findings of a Phase I environmental assessment recommend further environmental testing of the subsurface soil or groundwater, or Purchaser desires to conduct any invasive test, assessment (for example, a Phase II environmental assessment), survey, investigation, or other study of the soil and/or groundwater at the Property (collectively "<u>Environmental Testing</u>") during the Review Period, Purchaser must receive Seller's prior written consent before undertaking any such Environmental Testing, which consent shall not be unreasonably withheld, conditioned or delayed.  Any request for Seller's consent must include a description of the specific assessment work to be performed including the manner and scope of such work.  Purchaser's proposal should also include a health and safety plan for the proposed work scope.  If Seller consents to such assessment, Purchaser must give Seller seven (7) business days' notice prior to performing such Environmental Testing so that Seller may have the opportunity to be present and to split or take its own test samples.  Any Environmental Testing must be conducted in a manner so as not to permanently or materially damage the Property or interfere with current remediation efforts at the Property.  Purchaser must provide to Seller copies of all data and reports generated by such Environmental Testing within fourteen (14) days of data or report completion covering the field and laboratory data.  Purchaser must not submit a copy of any such data or report to any governmental authority unless specifically required to do so by applicable law; and, if so required, Purchaser must first provide to Seller a copy of any such data or report and related information and make reasonable efforts to allow Seller to suggest corrections or modifications thereto, prior to submitting such data or report to such governmental authority.

B.   <u>Seller's Documents</u>.  As of the Effective Date, Seller has made available to Purchaser or Purchaser's Representatives certain documents, reports and other records related to the Property and will provide additional documents to Purchaser after the Effective Date ("Due Diligence Documents").  A final list of Due Diligence Documents will be prepared at least two days before Closing.  **SELLER DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY SUCH DOCUMENT, REPORT OR RECORD, ITS PREPARATION OR ANY INFORMATION UPON WHICH IT IS BASED; HOWEVER, SELLER DOES REPRESENT AND WARRANT TO PURCHASER THAT**

**THE COPIES OF SUCH DOCUMENTS FURNISHED TO PURCHASER ARE ACCURATE AND COMPLETE COPIES OF THE DOCUMENTS IN SELLER'S POSSESSION.** Any reliance on any such document, report or record or any information contained therein provided by Seller will be at Purchaser's **sole risk.** Seller hereby advises Purchaser to conduct its own investigation to determine the accuracy of any document, report or record delivered to Purchaser and to determine the condition of the Property.

        C.    <u>Purchaser's Indemnification for Damage from Inspections.</u>  If any injury or damage to the Property is caused by the activities or operations of Purchaser or Purchaser's Representatives during the Review Period, Purchaser must immediately repair and restore, at its sole cost and expense, the Property to its former condition to the extent reasonably practical.  Notwithstanding anything to the contrary herein, the Title Company may not release the Earnest Money until Purchaser has notified Seller that the Property has been repaired and restored to the required condition and Seller has verified the condition of the Property as repaired or restored.  Purchaser is responsible for, and must acquit, release, and forever discharge and defend, indemnify and hold harmless Seller Related Parties from and against, any and all Claims that arise out of or relate to, in any way, Purchaser's or Purchaser's Representatives' entry, activities or operations on, or use or occupancy of, the Property during the Review Period.  The terms and conditions of this Section 11 survive, as applicable, the termination of this Agreement or the Closing and delivery of the Deed.  Notwithstanding the foregoing, Purchaser shall have no liability or obligation to Seller whatsoever for any loss of damage suffered by Seller on account of Purchaser's discovery of conditions that existed prior to Purchaser's inspections, investigations or tests.

        D.    <u>Insurance.</u>  Purchaser or Purchaser's Representatives accessing the Property must carry, commercial general liability coverage of not less than Two Million Dollars ($2,000,000.00) [combined single limit per occurrence] automobile liability insurance in amounts of not less than One Million Dollars ($1,000,000.00), and workers compensation and employer's liability insurance as required by the law of the state of California, covering liabilities arising out of Purchaser's activities on the Property.  Purchaser's insurance policy(ies) must:  i) cover Seller and its affiliates as additional insureds for liabilities arising from or assumed under this Agreement; and ii) be primary as to all other policies (including any deductibles or self-insured retentions).  It is further agreed that Purchaser and its insurer(s) providing coverage must waive all rights of subrogation and/or contribution against Seller and its affiliates.  Prior to commencement of any activities on the Property, Purchaser will deliver a true and correct copy of a certificate of insurance to Seller evidencing the required coverage and providing that should any of the policies above be cancelled before the expiration date thereof, notice will be delivered in accordance with the policy provisions.  Purchaser must ensure that Purchaser's Representatives are adequately insured without necessity of duplicating Purchaser's required insurance.

        E.    <u>Contaminated Media.</u>  To the extent permitted by law, Purchaser will be deemed to be the generator of all wastes caused by or originating from any Environmental Testing including, without limitation, any contaminated soil, sediment,

groundwater, surface water, piping, buried structures or other substance or materials that Purchaser or any of Purchaser's Representatives encounter, excavate, dredge or remove. Purchaser must sign all manifests for transportation and disposal of any such wastes without reference to Seller or any of its affiliated companies on the manifests. Copies of all such manifests must be provided to the Seller. Within twenty (20) days of completing any Environmental Testing, Purchaser must remove from the Property all such wastes generated by Purchaser's activities and properly dispose of such wastes at an appropriately licensed solid waste disposal facility. Purchaser and Purchaser's Representatives must ensure waste materials are properly contained and managed until they are properly disposed of.

F.    Purchaser's Right to Terminate.  Purchaser may terminate this Agreement at its sole option and discretion by giving notice to Seller on any day prior to and including the final day of the Review Period. Following such notice by Purchaser, Seller will return, or cause to be returned, to Purchaser any amount of the Earnest Money that is refundable. Upon such termination, **neither party will have any further rights, obligations or liability** under this Agreement, except as otherwise provided herein. If Purchaser fails to give notice of intent to terminate by the end of the Review Period, Purchaser will be conclusively presumed to have **waived** such right of termination. If Purchaser fails to give its termination notice on or before 5:00 p.m. Central Time on the last day of the Review Period then the Earnest Money will be nonrefundable except, as otherwise provided in this Agreement.

G.    Drugs, Alcohol, and Firearms.  While on the Property during the Review Period, neither Purchaser nor Purchaser's Representatives may be in possession of a firearm, or use, possess, sell, distribute, or be under the influence of alcohol or illicit or non-prescribed controlled drugs or substances at any time. Upon non-compliance with the preceding sentence, or upon reasonable cause for suspicion, Seller may immediately remove Purchaser or Purchaser's Representatives.

12.    **TAXES.**

Ad valorem taxes and special assessments, if any, will be prorated as of the Closing Date in accordance with Section 4.C, above, and Purchaser will assume and pay such taxes. Purchaser will be **solely responsible** for any and all subsequent assessments for prior years arising as a result of any change in ownership or change in land usage from and after the Closing Date. If tax statements or assessment statements are not available for the tax year of Closing, then the proration will be estimated and made on the basis of the tax or assessment statements for the preceding tax year; however, when actual tax statements and assessment statements for the year of Closing are available, a corrected proration of taxes and assessments will be made. In the event such taxes and assessments increase, Seller will pay to Purchaser Seller's pro rata share of such increase. In the event such taxes and assessments decrease, Purchaser will pay to Seller Seller's pro rata share of such decrease, computed to the Closing Date. Any such amounts due will be paid within thirty (30) days of the owing party's receipt of the request for payment from the other party. The terms and conditions of this Section 12 survive the Closing and delivery of the Deed.

Page 13 of 43

**13.    REPRESENTATIONS,    WARRANTIES,    COVENANTS    AND AGREEMENTS.**

A.    Representations and Warranties of Purchaser.    Purchaser represents and warrants to Seller as of the Effective Date as follows, and covenants that such representations and warranties will continue to be true and correct as of the Closing Date, and the truth of which is a condition precedent to Seller's obligations to close the transaction contemplated herein:

(1)    Purchaser has, and will have, full power and authority to perform the terms and conditions of this Agreement and execute all documents which are contemplated by this Agreement. All actions necessary to confer such authority on the individuals executing this Agreement and all documents that are contemplated by this Agreement have been taken.

(2)    The execution by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby do not i) result in a breach of any of the terms or conditions of, or ii) constitute a default or a condition which upon notice or lapse of time or both would ripen into a default under, in both cases, any indenture, agreement, instrument or obligation to which Purchaser is a party.

(3)    Purchaser is not regarded as a "blocked person" on the Treasury Department's Office of Foreign Asset Control's list, issued under 31 Code of Federal Regulations, Section 594.

(4)    Purchaser is solvent, in good standing, is not in the hands of a receiver, nor is any application of receivership pending and no proceedings are pending by or against Purchaser for bankruptcy or reorganization in any state or federal court. Purchaser will have sufficient funds to deliver the Purchase Price at Closing as contemplated in this Agreement.

(5)    In the event Purchaser closes this transaction, Purchaser will be deemed to represent that (i) it has performed sufficient review and investigation, including, without limitation, review and investigation concerning the Property, to evaluate the Property to its satisfaction and to enable it to make an informed decision, as a prudent and knowledgeable purchaser, to acquire the Property; (ii) it has evaluated the merits and risks of purchasing the Property and has formed an opinion based solely upon its knowledge, experience and investigations, and not upon any statements or actions by Seller Related Parties; and (c) other than Seller's Limited Representations and Warranties, it has not relied on statements or actions by Seller, its agents or assigns, in making its decision to acquire the Property.

B.    Representations and Warranties of Seller.    Seller represents and warrants to Purchaser as of the Effective Date as follows, and covenants that such representations and warranties will continue to be true and correct as of the Closing Date, and the truth of which is a condition precedent to Purchaser's obligations to close the transaction contemplated herein:

(1)     Seller has, and will have, full power and authority to perform the terms and conditions of this Agreement and execute all documents which are contemplated by this Agreement.  All actions necessary to confer such authority on the individuals executing this Agreement and all documents that are contemplated by this Agreement have been taken.

(2)     The execution by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not i) result in a breach of any of the terms or conditions of, or ii) constitute a default or a condition which upon notice or lapse of time or both would ripen into a default under, in both cases, any indenture, agreement, instrument or obligation to which Seller is a party or by which the Property or any portion thereof is bound.

(3)     Seller is not regarded as a "blocked person" on the Treasury Department's Office of Foreign Asset Control's list, issued under 31 Code of Federal Regulations, Section 594.

(4)     Seller is not a "foreign person" as defined in Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

C.     The representations, warranties, covenants and agreements of Seller and Purchaser contained in this Section 12 will terminate eighteen (18) months following the Closing Date unless specifically stated otherwise.

14.    **INSURANCE**

A.     <u>Notice of No Right's to ExxonMobil's Insurance.</u>

(1)     Seller and Purchaser acknowledge that Exxon Mobil Corporation maintains a worldwide program of property and liability insurance coverage for itself and its affiliates, including Seller.  This program has been designed to achieve a co-coordinated risk management package for the entire Exxon Mobil Corporation corporate group. The program consists principally of three types of policies:

(a)     Policies issued to Exxon Mobil Corporation or its predecessors ("<u>ExxonMobil</u>");

(b)     Policies issued directly to affiliates by one of ExxonMobil's wholly-owned insurance companies, i.e., Ancon Insurance Company, Inc., Bluefield International Insurance Inc., et al, (herein referred to collectively as "ExxonMobil Captive Insurers"); and

(c)     Policies issued to affiliates by locally admitted insurers which are reinsured by one of the ExxonMobil Captive Insurers.

(d)     All of the insurance policies through which the worldwide program of coverage is presently or has previously been provided by or to

Exxon Mobil Corporation, its predecessors or affiliates are herein referred to collectively as the "ExxonMobil Policies."

(2)    It is understood and agreed by Purchaser that from and after the Closing Date:

(a)    No insurance coverage will be provided under the ExxonMobil Policies to Purchaser;

(b)    Any and all policies insured or reinsured by any of the ExxonMobil Captive Insurers which, but for this provision, would have insured the Property will be deemed terminated, commuted and cancelled ab initio; and

(c)    No Claims regarding any matter whatsoever, whether or not arising from events occurring prior to the Closing, will be made by Purchaser against or with respect to any of the ExxonMobil Policies regardless of their date of issuance.

(3)    Purchaser will **acquit, release and forever discharge, defend, indemnify and hold harmless** Seller Related Parties from any and all Claims made after the Closing against any of the ExxonMobil Policies by Purchaser or any company or person claiming to be subrogated to Purchaser's rights, including all costs and expenses (including attorney's fees) related thereto.  Such indemnity will cover, without limitation, any Claim by an insurer for reinsurance, retrospective premium payments or prospective premium increases attributable to any such Claim.

B.    Purchaser's Insurance.  Purchaser agrees to obtain and maintain or cause to be obtained and maintained Pollution Legal Liability (PLL) insurance coverage written by an insurer reasonably acceptable to Seller and rated not lower than "A" or better by AM Best & Company for a five (5) year period post-closing, naming Seller as an additional named insured.

C.    The terms and conditions of this Section 14 survive the Closing and delivery of the Deed.

**15.    REAL ESTATE COMMISSION / BROKER.**

Seller represents and warrants that it has employed no real estate broker, agent, finder or intermediary other than Jones Lang LaSalle Americas, Inc. ("Seller's Agent"), and Purchaser represents and warrants that it has employed no real estate broker, agent, finder or intermediary ("Purchaser's Agent") in both cases in connection with the purchase and sale contemplated by this Agreement.  Seller is responsible for payment of a brokerage commission to Seller's Agent upon the Closing and funding of the sale of the Property in accordance with terms set out in Seller's written listing agreement with Seller's Agent.  Seller will pay no other commission or finder's fee in connection with this transaction.  Any payment to Purchaser's Agent will be made pursuant to a separate agreement between Purchaser's Agent and Seller's Agent or Purchaser's Agent and Purchaser.

Except as stated above, Seller and Purchaser each represent to the other that it has had no dealings or contacts of any kind with any real estate broker, agent, finder or intermediary with respect to i) this Agreement, ii) the negotiation of this Agreement, or iii) any transaction related to or incidental to this Agreement. Each party will forever **defend, indemnify, and hold harmless** the other party with respect to any and all Claims in connection with any claim for a finder's or broker's fee or commission asserted by a person or entity claiming to have acted as agent for or to have been engaged by the indemnifying party. ***The terms and conditions of this section survive, as applicable, the termination of this Agreement or the Closing and delivery of the Deed.***

## 16.   TERMINATION; DEFAULT; AND REMEDIES.

A.    If Purchaser delivers its Approval Notice and does not close the transaction contemplated by this Agreement or fails to perform any of Purchaser's other obligations either before or at Closing for any reason other than i) the termination of this Agreement by Purchaser pursuant to a right to terminate provided by this Agreement, or ii) Seller's failure to perform Seller's obligations under this Agreement, then Seller, as **Seller's sole and exclusive remedy**, except as otherwise provided in this Agreement, will have the right to terminate this Agreement by notice to Purchaser at or before Closing, whereupon **neither party will have any further rights, obligations or liability** under this Agreement, except as otherwise provided herein, and Seller will retain the otherwise refundable Earnest Money as **liquidated damages**, free of any claims by Purchaser or any other person. The Earnest Money to which the Seller is entitled under this section is a reasonable forecast of just compensation for the harm that would be caused by Purchaser's breach of this Agreement. Furthermore, the harm that would be caused by Purchaser's breach is one that is incapable of or very difficult to accurately estimate and the payment of the Earnest Money upon Purchaser's breach will constitute full satisfaction of Purchaser's obligations under this Agreement. If Purchaser disputes Seller's termination of the Agreement and its retention of the Earnest Money and either Seller or Purchaser files an action seeking a declaratory judgment with respect to the disposition of the Earnest Money, the prevailing party in such proceeding shall be entitled to recover its reasonable legal fees and disbursements actually incurred in connection with such proceeding, as well as any damages, losses, costs or expenses incurred by such prevailing party.

B.    If Seller does not close the transaction contemplated by this Agreement or fails to perform any of Seller's other obligations either before or at Closing for any reason other than i) the termination of this Agreement by Seller pursuant to a right to terminate provided by this Agreement, or ii) Purchaser's failure to perform Purchaser's obligations under this Agreement, then Purchaser, as **Purchaser's sole and exclusive remedy**, except as otherwise provided in this Agreement, will have the right to either a) enforce specific performance of Seller's obligations under this Agreement or b) terminate this Agreement by notice to Seller at or before Closing, whereupon **neither party will have any further rights, obligations or liability** under this Agreement, except as otherwise provided herein, and the Title Company, except as otherwise provided, will deliver the Earnest Money to Purchaser, free of any claims by

Seller or any other person.  Notwithstanding the foregoing, if the remedy of specific performance is not feasible (e.g., because Seller has transferred the Property or any portion thereof or because a judgment lien or other defect of title has arisen which cannot be satisfied out of Seller's proceeds from Closing), Purchase shall be entitled to pursue whatever remedies are available to Purchaser under this Agreement at law or in equity.

### 17.   CONDEMNATION; CASUALTY.

A.   If, before Closing, the Property or any part of the Property is condemned or taken by eminent domain, or if Seller has received notice of a proposed taking, Seller will promptly give notice to Purchaser, together with copies of all writings received by Seller in this regard and will promptly deliver to Purchaser all notices and other writings thereafter received by Seller pertaining to the taking.  If such taking or condemnation would materially and adversely interfere with Purchaser's use of the Property in Purchaser's reasonable opinion, then Purchaser, at its option, may terminate by notice delivered to Seller by the earlier of i) the Closing Date, or ii) within twenty (20) days after Purchaser has received notice of such taking or condemnation, and the Earnest Money will be returned to Purchaser, and both parties **will be released from any further liability and obligations** hereunder, except as otherwise provided.  If the Purchaser does not so elect to terminate this Agreement, then the Closing will take place as provided herein, and Seller will assign to Purchaser at Closing all interest of the Seller in and to any condemnation awards that may be payable to the Seller on account of such taking or condemnation.

B.   If prior to the Closing, any taking or condemnation of a portion of the Property occurs or is threatened, that in Purchaser's reasonable opinion, is not material to Purchaser's use of the Property, then Purchaser will have no right to terminate this Agreement, and Seller will assign to Purchaser at Closing all interest of the Seller in and to any condemnation awards that may be payable to the Seller on account of such taking or condemnation.

C.   Prior to Closing, risk of loss with regard to the Property by reason of casualty (except as provided below) is borne by Seller, and after Closing will be borne by Purchaser. If, prior to Closing, all or a substantial portion of the Property is materially damaged by fire or other casualty, then Purchaser has the option, which must be exercised by Purchaser within fifteen (15) days after receipt of notice from Seller advising of such casualty, to terminate this Agreement (in which case Purchaser shall receive a refund of the Earnest Money and Seller shall reimburse Purchaser for reasonable out-of-pocket third party costs incurred by Purchaser in connection with the inspections and investigations of the Property including without limitation any Environmental testing) in an amount not to exceed $20,000.00.  In the case of a casualty, if Purchaser elects to proceed to Closing, there will be no adjustment of the Purchase Price and no assignment of any insurance proceeds. In the event Purchaser fails to notify Seller within such fifteen (15) day period, as provided in this paragraph, Purchaser will have **waived the right** to terminate and be deemed to have elected to proceed to Closing

18.   **TIME OF ESSENCE.**

Time is of the essence to both Seller and Purchaser in connection with this Agreement and the performance of obligations under it. The parties have agreed that strict compliance by both of them is required as to all dates and time periods set out herein.

19.   **TIME PERIODS.**

Any and all time periods given in this Agreement which are specified by a certain number of days refers to calendar days, unless "business days" is otherwise expressly provided. If the final day of any time period set out in this Agreement falls on a Saturday, Sunday or Legal Holiday, then such time period will be extended to the next business day which is not a Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" includes any national bank holiday and will include the extra days that Seller's offices are closed which are the Friday after Thanksgiving and one day before or after Christmas or two days before or after Christmas if Christmas falls on a Saturday or Sunday, in which event, Seller will advise Purchaser which day(s) before or after Christmas Seller's offices will be closed.

20.   **ENTIRE AGREEMENT; FURTHER WARRANTIES.**

This Agreement and all of its attachments and exhibits constitute the entire agreement between Seller and Purchaser with regard to the subject matter hereof, and all prior agreements and undertakings, both written and oral, are merged in it. **Neither party is bound by any prior representations, warranties, covenants, agreements, promises, or assurances whatsoever and by whomsoever made other than those representations, warranties, covenants, agreements, promises, or assurances specifically set forth in this Agreement, if any.** Furthermore, except for Seller's Limited Representations and Warranties, if any, **NO OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE MADE OR EXTENDED BY SELLER.**

21.   **NO RECORDING.**

This Agreement may not be recorded in the real property records of Los Angeles County or any other county or with any public agency. If either party records this Agreement or any memorandum of it without the prior written consent of the other party, which consent may be withheld at that party's sole option and discretion, the non-recording party may, among other remedies available to it at law or equity, terminate this Agreement by filing an affidavit of termination in the real property records where the Agreement was recorded.

22.   **ATTORNEYS' FEES.**

If either party institutes an action or proceeding against the other arising out of or relating to the terms and conditions of this Agreement or any default hereunder, the non-prevailing party to such action or proceeding will reimburse the prevailing party therein for the reasonable expenses and attorneys' fees, including,

without limitation, expert witness fees and costs, all disbursements and litigation expenses incurred by the prevailing party.

### 23. BINDING EFFECT AND ASSIGNMENT.

This Agreement binds and inures to the benefit of the parties and their respective successors and permitted assigns; however, this Agreement must not be assigned by Purchaser without Seller's prior written consent, except that Purchaser may assign this Agreement without Seller's consent to any person or entity which controls Purchaser, is controlled by Purchaser or which is under common control with Purchaser. Any assignment without Seller's written consent will be void and without effect. Consent by Seller to any assignment of this Agreement will not operate as a waiver of Seller's right to approve any subsequent requests for assignment. In no event will any consent to assignment by Seller or any such assumption by any assignee release or relieve Purchaser from its obligations under this Agreement.

### 24. TERMINOLOGY.

The captions beside the numbered paragraphs of this Agreement are for convenience only and do not limit, enlarge, modify, or otherwise affect this Agreement. Wherever required by the context, any one gender includes all other genders, the singular includes the plural, and the plural includes the singular. As used herein, the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions and the word "or" is not intended to be exclusive. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. All references in this Agreement to a "Section" or an "Exhibit" are to a section or exhibit of this Agreement, unless the context otherwise requires. Unless the context otherwise requires, the words "this Agreement," "hereof," "hereunder," "herein," or words of similar import refer to this Agreement as a whole and not to a particular section, paragraph, clause or other subdivision.

### 25. CONSTRUCTION.

The terms and conditions of this Agreement will be construed as a whole according to their common meaning to achieve the objectives and purposes of this Agreement. Each of the parties represents and acknowledges that i) it and its respective counsel have reviewed this Agreement, and ii) this Agreement has been freely negotiated between the parties. The rule of construction that any ambiguities are to be resolved against the drafting party will not be employed in interpreting or construing this Agreement as both Seller and Purchaser acknowledge and agree they have equal bargaining power for purposes of this Agreement. Except as otherwise specifically provided herein, whenever a party's consent or approval is required in this Agreement, such party's consent or approval will not be unreasonably withheld, conditioned or delayed.

### 26. GOVERNING LAW; VENUE; COMPLIANCE WITH LAWS.

A.      This Agreement is being executed and delivered, and is intended to be performed, in the state of California, and the laws of the state of California govern the validity, construction, enforcement, and interpretation of this Agreement, without regard to, or effect of, any choice or conflict of law principles or rules, unless otherwise specified herein.

B.      By executing this Agreement, the parties **consent to the exclusive venue and jurisdiction** of any federal or state court sitting in the county of Los Angeles and state of California in any action arising out of or in any way related to this Agreement. The parties **irrevocably and unconditionally submit to the jurisdiction** (both subject matter and personal) of any such court and **irrevocably and unconditionally waive: i) any objection any party might now or hereafter have to the venue in any such court; ii) any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum.**

C.      Each party covenants and agrees that it will, at all times, comply with all applicable laws in its performance under this Agreement.

### 27.    NO WAIVER.

Except as otherwise specifically provided in this Agreement, failure by Purchaser or Seller to insist upon or enforce any rights herein will not constitute a waiver thereof or of any other provision herein. No waiver by either party of a breach by the other party will be deemed to be a waiver of any subsequent breach by the same party of the same or any other provision. Neither this Agreement nor any of its terms and conditions can be waived, discharged or terminated, except by an instrument in writing signed by the party against whom enforcement of the waiver, discharge or termination is sought.

### 28.    WAIVER OF JURY TRIAL.

**SELLER AND PURCHASER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.**

### 29.    SEVERABILITY.

The terms and conditions of this Agreement are severable. If a court of competent jurisdiction finds that any term or condition of this Agreement is unenforceable, the remaining terms and conditions will remain in effect without the unenforceable parts.

### 30.    MODIFICATION.

Any amendment, change, supplement or modification of this Agreement must be in writing and executed by the parties.

31.     **FURTHER ASSURANCES.**

Purchaser and Seller will execute and deliver to the other, whether prior to or after Closing, such further documents or instruments as may be reasonable and necessary in furtherance of the performance of the terms, covenants and conditions of this Agreement.  The terms and conditions of this section survive the Closing and the delivery of the Deed.

32.     **NOTICES.**

Any notices or other communications required or permitted under this Agreement must be in writing and made by electronic mail, facsimile (with confirmation of receipt), nationally recognized overnight delivery service by a carrier such as Federal Express or UPS that requires receipt of delivery, personal delivery, or registered or certified mail, postage prepaid, return receipt requested.  Said notice or communication will be deemed received on the earlier of:  i) the date of actual receipt (or rejection of delivery) of the notice or communication by the intended recipient, or ii) the third day after the date mailed.  Notices or communications received or delivered after 5:00 p.m. Central Time on a given day will be deemed received on the next following day.  In order for any notice or communication sent by electronic mail or facsimile to be effective, said notice or communication must also be provided concurrently by one of the other methods described in this section.   Notices or communications must be addressed as provided below, but each party may change its address by written notice in accordance with this section.

|  |  |
|---|---|
| To Seller: | Exxon Mobil Corporation |
|  | Attention:  Brian Steelman |
|  | Commercial Portfolio Manager |
|  | 22777 Springwoods Village Parkway, W3.2B.481 |
|  | Spring, Texas 77389 |
|  | Phone:       (832) 625-3055 |
|  | Email: brian.steelman@exxonmobil.com |
|  |  |
| With a copy to: | Exxon Mobil Corporation |
|  | Attention:  Annette Moore |
|  | Counsel |
|  | P. O. Box 812 |
|  | Kittredge, Colorado 80457 |
|  | Phone:       (303) 670-3683 |
|  | Email: annette@mooreenvirolaw.com |
|  |  |
| To Purchaser: | PC Venice and Sepulveda LLC |
|  | Attention:  Rahul Paliwal |
|  | 1507 7th Street #201 |
|  | Santa Monica, California 90401 |
|  | Phone:       (855) 955-1041 x701 |
|  | Email:  rp@pacificcollective.com |

|                    |                                          |
|--------------------|------------------------------------------|
| With a copy to:    | Dzida, Carey & Steinman                  |
|                    | Attention:  Steven J. Dzida             |
|                    | 3 Park Plaza, Suite 750                  |
|                    | Phone:        (949) 399-0363             |
|                    | Facsimile:    (949) 399-0361             |
|                    | Email:  sdzida@dcslaw.com                |
|                    |                                          |
| To Title Company:  | First American Title Company             |
|                    | Attention:  Ms. Sharon Mork             |
|                    | 1790 Hughes Landing Boulevard, Suite 110 |
|                    | The Woodlands, Texas                     |
|                    | Phone:        (832) 246-5342             |
|                    | Fax:          (888) 581-0730             |
|                    | Email:  smork@firstam.com                |

## 33.   CONFIDENTIALITY AND PUBLIC STATEMENT OR RELEASES; TRADEMARKS.

A.     Except as may be reasonably required in connection with the consummation of the transaction contemplated hereby, Purchaser and Seller, before Closing must keep confidential i) the existence of this Agreement and the terms and conditions hereof, ii) all documents and other information provided by Seller to Purchaser and by Purchaser to Seller, and iii) any information contained in any environmental assessment, data or other study or test concerning the Property, whether performed pursuant to Section 11 or otherwise (collectively "Confidential Information"). Purchaser and Seller must not disclose any Confidential Information to any person other than i) its employees, ii) consultants who are engaged to assist Purchaser in deciding whether to acquire the Property, including, without limitation, legal counsel iii) lenders for financial purposes, and iv) Seller or Purchaser, as applicable.   The term "Confidential Information" does not include any such information that is in the public domain through a source other than the other party hereto.   Prior to disclosing information to any person, including those listed, Purchaser, or Seller, as applicable, must require that the person (other than Seller) agree in writing to keep the information confidential.   If Purchaser, or Seller, as applicable, is compelled by applicable legal process to disclose any Confidential Information, Purchaser, or Seller, as applicable, must not disclose the information until after first notifying the other party of the proposed disclosure, giving the other party a reasonable opportunity to seek injunctive relief against such disclosure and providing the other party with a complete copy of all transmittals of the information to be provided to the applicable governmental body.   If the Closing does not occur within the time required by this Agreement, or upon earlier termination of this Agreement, Purchaser, or Seller, as applicable, must promptly deliver to the other party all originals and copies of all Confidential Information in such party's or its employees', consultants', lenders', or other agents' or representatives' possession. Purchaser, or Seller, as applicable, must cause any third parties to whom it has disclosed all Confidential Information to return such Confidential Information promptly to the other party, or to provide a written certificate that such Confidential Information has been permanently destroyed without retaining any copies.

B. Prior to the Closing, neither the Seller nor Purchaser (including their respective employees, agents or representatives) may issue any press releases whether to any periodicals, newspapers, radio, television, or other media, concerning the transaction contemplated in this Agreement or with respect to any of the terms or conditions herein contained, without the prior written approval of the other, which approval is at the sole option and discretion of said other party.

C. Notwithstanding Section 16 above, in the event the confidentiality terms and conditions of this Section 33 are violated, the parties to this Agreement acknowledge and agree that injunctive relief is an appropriate and necessary remedy for such violation, that no adequate remedy at law exists, and that the requirement for a bond to be posted for the issuance of such injunctive relief will be waived. In the event of any such violation, the non-violating party will be entitled to seek equitable relief in addition to all remedies and damages to which it might be entitled under common law or at equity for a violation of this Section 33.

D. The rights in or rights to use any name, trade name or trademark (including any former name, trade name or trademark) of Seller or its affiliates are excluded from this transaction and are not a part of the sale and conveyance of the Property.

## 34. SURVIVAL.

The terms, conditions and obligations of this Agreement that cannot be performed before termination or Closing or that either expressly or by their nature survive termination or the Closing and the delivery of the Deed, as applicable, will survive termination or the Closing and delivery of the Deed, and the legal doctrine of merger will not apply to these matters.

## 35. TAX DEFERRED EXCHANGE

Seller and Purchaser may elect by notice to the other before the Closing Date to effect a tax-deferred exchange under Section 1031 of the Internal Revenue Code of all or part of the Property, provided that no such exchange may delay the Closing. If a party so elects, the other party will cooperate with and accommodate the electing party and will execute escrow instructions, documents, agreements, or other instruments, as reasonably requested by the electing party, to effect the exchange, provided that the cooperating party shall not be obliged to take title to any property other than the Property and shall incur no cost or liability on account such cooperation. The electing party may assign its rights and delegate its duties under this Agreement to an exchange intermediary that it selects, as may be necessary to effect a tax-deferred exchange.

## 36. STANDARDS OF BUSINESS CONDUCT.

The parties (and their employees, agents and contractors), in performing their obligations under this Agreement, must exercise reasonable care and diligence to prevent any action or condition which may result in a conflict of interest with those of the

other party. Each party's compliance with this requirement includes but is not limited to, establishing precautions to prevent that party's employees or agents from making, receiving, providing or offering substantial gifts, entertainment, payments, loans or other considerations for the purpose of influencing individuals to act contrary to the other party's best interest. Each party must promptly notify the other party of the identity of its representatives or employees who are known in any way to have a substantial interest in the other party's business or the financing thereof.

### 37.   INDEPENDENT CONTRACTOR.

Nothing herein creates anything other than a purchaser-seller relationship between Seller and Purchaser.  The parties affirm and acknowledge they are each independent and separate business entities, and nothing in this relationship creates a joint venture, partnership, agency, fiduciary, franchise or employer-employee relationship between the parties.

### 38.   FORCE MAJEURE.

The deadline for performance of any obligation of a party hereunder shall be automatically extended one day such performance is delayed on account of force majeure, which as used herein means acts of God, strikes, lockouts, sit-downs, material or labor restrictions by any governmental authority, civil riot, floods, wash-outs, explosions, earthquakes, fires, storms, acts of the public enemy, acts of terrorism, wars, insurrections, defaults by the other party and any other cause not reasonably within the control of the party whose performance is delayed by force majeure and which, by the exercise of due diligence, the claiming party is unable, wholly or in part, to prevent or overcome.

### 39.   NO THIRD-PARTY BENEFICIARIES.

The terms and conditions of this Agreement do not impart or confer any right, interest, remedy or claim enforceable by any person, firm or organization not a party hereto or not a successor or assignee of a party to this Agreement. Notwithstanding the preceding sentence, Seller Related Parties may enforce the terms and conditions of Section 8, above.

### 40.   COUNTERPARTS.

This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document.  This document will not be binding on or constitute evidence of a contract between the parties until such time as a counterpart of this document has been executed by each party and an original thereof delivered to the other party to this Agreement.  Electronic signatures alone are not binding on either party.

### 41.   EXHIBITS.

All attachments and exhibits to this Agreement are incorporated herein for all purposes.  The attachments and exhibits are as follows:

| | | |
|---|---|---|
| *Exhibit "A"* | - | Property Description |
| *Exhibit "B"* | - | Grant Deed/Environmental Restrictions |
| *Exhibit "C"* | - | Non-foreign Affidavit/FIRPTA |
| *Exhibit "D"* | - | Purchaser's Redevelopment Plans |
| *Exhibit "E"* | - | Akron Transaction -- Letter Agreement |

**EXECUTED IN TRIPLICATE ORIGINALS** on the dates shown by the signatures below, to be effective on the date of the signature on behalf of Seller, which will be the Effective Date ("Effective Date") of this Agreement.

*[Signature pages follow.]*

**SELLER:**

**EXXONMOBIL OIL CORPORATION,**
a New York corporation

By: Maria M. Quezada
Agent and Attorney-in-Fact

Date: _February 3_, 2020
(Effective Date)

**PURCHASER:**

**PACIFIC COLLECTIVE, LLC,**
a Delaware limited liability company

By: _____ Rahul Paliwal
_Managing Director_____ [name and title]
Date: ___November 5_____, 2019

The Title Company executes this Agreement to ~~acknowledge receipt of the Earnest Money and to~~ evidence its agreement to handle and dispose of the Earnest Money and otherwise to perform the duties of the Title Company in accordance with the terms and conditions of this Agreement.

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____

Name: _Sharon P. Mark_

Title: _VP/Sr. Escrow Officer_

Date: _February 3_ ,20__

**EXHIBIT "A"**

**To Sale and Purchase Agreement between
ExxonMobil Oil Corporation, as Seller, and PC Venice and Sepulveda LLC, as
Purchaser**

## PROPERTY DESCRIPTION

That portion of Lot 15 as shown on map of the 120.71 acre tract, belonging to the Estate of Pedro Talamantes, deceased, in the Rancho La Ballona, in the City of Culver City, County of Los Angeles, State of California, filed in Case No. 7078 of the Superior Court, described as follows:

Beginning at the Point of Intersection of the Southwesterly line of said Lot 15, with the Southeasterly line of the thirty (30) foot strip conveyed to the County of Los Angeles by deed recorded in Book 4224, Page 208 of Deeds, Records of said county; thence South 33°13' East along said Southwesterly line, a distance of One Hundred Thirty (130) feet; Thence North 55°48'30" East, parallel with the Southeasterly line of the Thirty (30) foot strip conveyed to said County of Los Angeles by deed hereinbefore referred to, a distance of One Hundred Fifty (150) feet; Thence North 33°13' West parallel with the Southwesterly line of said Lot 15, a distance of One Hundred Thirty (130) feet to a point in the Southeasterly line of said Thirty (30) foot strip; Thence South 55°48'30" West along said Southeasterly line One Hundred Fifty (150) feet to the Point of Beginning.

Excepting therefrom the Southwesterly Fifty (50) feet thereof included within the line of Sepulveda Boulevard.

APN: 4213-018-014

## EXHIBIT "B"

To Sale and Purchase Agreement between **EXXONMOBIL OIL CORPORATION,**
as Seller, and **PC VENCIE AND SEPULVEDA LLC,** as Purchaser.

## GRANT DEED/ENVIRONMENTAL RESTRICTIONS
## SOUTHERN CALIFORNIA

| | | |
|---|---|---|
| STATE OF CALIFORNIA | § | |
| | § | **KNOW ALL MEN BY THESE PRESENTS:** |
| COUNTY OF LOS ANGELES | § | |

Date: _____, 2019

Grantor: **EXXONMOBIL OIL CORPORATION,**
a New York corporation

Grantor's Mailing Address: 22777 Springwoods Village Parkway
W3.2B.481
Spring, Texas 77389

Grantee: **PC VENICE AND SEPULVEDA LLC**

Grantee's Mailing Address: 1507 7th Street #201
Santa Monica, CA 90401

Consideration: $10.00  cash and other valuable consideration, the receipt
and sufficiency of which are hereby acknowledged.

Property: The surface estate that certain .30 acre parcel of land,
located in Culver City, County of Los Angeles, State of
California, said parcel being further described on **Appendix
"A"** attached hereto, together with all improvements,
fixtures, and personal property, if any, located on or under
the Property, and all of Grantor's rights, titles, interests,
licenses, privileges, hereditaments and appurtenances, if
any inuring to the benefit of the Property including, without
limitation, all right, title and interest of Grantor in and to all
adjacent streets, alleys, rights of way, and, if any, benefiting
and/or burdening the Property.

SJD\ 30853-0002\ 673138.3 7/25/2019

**59**

Reservations from and Exceptions to Conveyance and Warranty:

1.    Permitted Encumbrances.  This Grant Deed/Environmental Restrictions is subject only to any and all (i) valid and subsisting easements, rights-of-way, conditions, covenants, restrictions, reservations, exceptions and other encumbrances of record (not including liens), (ii) all building and land use ordinances, laws, regulations and restrictions by municipal or other governmental authority applicable to the Property, and (iii) any rights in or encumbrances on the Property which are evident by a physical inspection or survey of the Property.

2.    Taxes.  Taxes and assessments for the current year are prorated as of the Effective Date above, and Grantee assumes the payment of such taxes and assessments after this Effective Date.

3.    Use Restrictions:   No Residential Use.   No Use of Groundwater.   No Substructures.  No Agricultural Use.  To ensure the continued protection of the environment and the health and safety of current and future owners of the Property the following restrictive covenants and environmental covenants, which pursuant to California Civil Code Section 1471(b), will be established and run with the land and will be binding on all current and future owners of the Property, and their respective heirs, successors and assigns, lessees, or other occupiers and users of the Property:

    a)    The Property may not be used for any "residential" construction, development, use, or purpose, which shall without limitation be interpreted to mean and include a prohibition against use for single or multi-family residences, residences for children, the elderly or the infirm, churches and places of worship, schools, nurseries and other pre-school facilities, nursing or convalescent homes, hospitals, health clinics, or other medical facilities, day care facilities, playgrounds, recreational parks, hotels, motels, bed and breakfasts, parks, and any other "Residential land use" restrictions or limitations set forth or described in any and all building, zoning and land use ordinances, laws, regulations and restrictions by municipal or other governmental authorities applicable to the Property. Notwithstanding the above, the Property may be used for high density residential as long as there are no residential units on the ground floor and ground floor uses are commercial only.

    b)    No groundwater in or under the surface of the Property may be used for any potable purposes. The construction or installation of any water supply well, whether for drinking, human consumption, or any other potable purpose on the Property is prohibited.

    c)    Grantee, at its sole cost and expense, shall use appropriately engineered impervious vapor barriers or liners designed, constructed and maintained to prevent the migration of hydrocarbon vapors, if any, from the soil to the

interior of any structures to be constructed at or on the Property in areas where a building will be constructed.

d) The restrictions, prohibitions and limitations contained in immediately preceding subparagraphs "a," "b," and "c," above, are referred to as "Use Restrictions."

e) Grantor reserves for itself and Grantor's Related Parties, defined hereinafter, a right of access to the Property, at no cost to Grantor, for the sole purposes of remediation activities conducted to achieve a "No Further Action" letter from the Regional Water Quality Control Board and to abandon monitoring wells after receipt of a "No Further Action" letter from the Regional Water Quality Control Board. Grantor may also temporarily store remediation wastes on the Property, in compliance with all laws, generated pursuant to remediation activities and monitoring well abandonment. Once a "No Further Action" letter is received from the Regional Water Quality Control Board and all monitoring wells have been abandoned, access rights hereunder will terminate. The access rights in this paragraph are referred to as "Access Rights."

f) These Use Restrictions and Access Rights shall run with the land, are binding on Grantor and Grantee and all their successors and assigns, as well as all future occupants and owners of the Property and shall be recognized in, and survive, all subsequent sales, transfers, leases, assignments or other conveyances, in whole or part, of the Property. The Use Restrictions shall be referenced in all deeds or other instruments associated with any subsequent sale, transfer, lease, assignment or other conveyance, in whole or in part, of the Property, and the failure to include the Use Restrictions in any future deeds or instruments shall in no way limit or impair the validity of the Use Restrictions. The Use Restrictions will remain effective and in force permanently unless and until waived in writing by Grantor, in its sole discretion.

4. "AS-IS" Conveyance. No Warranties. As a material part of the Consideration for this Special Warranty Deed, Grantor and Grantee acknowledge and agree that Grantee is taking the Property "**AS IS, WHERE IS, WITH ALL FAULTS,**" with any and all latent and patent defects and that there is no warranty by Grantor that the Property has a particular financial value or is fit for a particular purpose. Grantee acknowledges and stipulates that Grantee is not relying on any representation, statement, agreement, inducement or other assertion with respect to the condition of the Property (to include, without limitation, the environmental or physical condition) but is relying solely on Grantee's examination of the Property. Grantee takes the Property with the express understanding and stipulation that **there are no express or implied warranties or representations by Grantor of any kind.  Grantee's acceptance of the Property is at the sole risk and liability of Grantee with respect to i) the**

present status and condition of the Property, ii) the suitability, fitness or acceptability of the Property for Grantor's purposes and iii) the right of Grantee to access the Property or to ingress and egress to and from the Property. Further, Grantee acknowledges and stipulates that it has had access to the Property to conduct its own investigation and assessment and is well aware of the condition of the Property.

5. Release.

a) GRANTEE'S RELEASE. GRANTEE, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS. I) **AGREES AND COVENANTS NOT TO SUE** GRANTOR'S RELATED PARTIES (AS DEFINED BELOW) FOR ANY AND ALL CLAIMS (AS DEFINED BELOW),UNLESS SUCH CLAIMS ARISE OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY GRANTOR'S RELATED PARTIES AND II) **AGREES TO ACQUIT, RELEASE AND FOREVER DISCHARGE** GRANTOR'S RELATED PARTIES FROM ANY AND ALL CLAIMS, IN BOTH CASES, THAT ARISE OUT OF OR RELATE TO, IN ANY WAY, THE CONDITION, OWNERSHIP, USE, MAINTENANCE OR OPERATION OF THE PROPERTY AT ANY TIME, WHETHER BEFORE, ON OR AFTER THE DATE ABOVE NO MATTER HOW OR WHEN CAUSED, WHETHER KNOWN OR UNKNOWN, THAT ARE ASSERTED OR MADE BY ANY PERSON OR ENTITY, WHETHER PUBLIC OR PRIVATE, UNDER ANY LAW, UNLESS SUCH CLAIMS ARISE OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY GRANTOR'S RELATED PARTIES  AS USED HEREIN, THE TERM "LAW" SHALL MEAN ANY STATUTE, LAW, RULE, REGULATION OR ORDINANCE, WHETHER FEDERAL, STATE OR LOCAL, WHETHER AT LAW OR EQUITY, WHETHER BY STATUTE, COMMON LAW, ADMINISTRATIVE OR REGULATORY PROCEEDING OR OTHERWISE, WHETHER BASED ON THE NEGLIGENCE, , STRICT LIABILITY, OR OTHER CONDUCT OF ANY PARTY HERETO OR OTHERWISE, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, THE RESOURCES CONSERVATION AND RECOVERY ACT, THE CLEAN AIR ACT, THE SAFE DRINKING WATER ACT, AND THE CLEAN WATER ACT, OR SIMILAR OR COUNTERPART STATE STATUTES.  AS USED HEREIN, THE TERM "CLAIMS" SHALL MEAN ANY AND ALL LOSSES, DAMAGES, CLAIMS, CAUSES OF ACTION, CROSS-CLAIMS, COUNTERCLAIMS, RIGHTS OF CONTRIBUTION OR INDEMNITY, RIGHTS OF REIMBURSEMENT, LIENS, SUITS, LIABILITIES, DEMANDS, PAYMENTS, EXPENSES, COSTS AND FEES, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, ATTORNEYS' AND EXPERT WITNESS FEES, COURT COSTS, CIVIL OR CRIMINAL PENALTIES OR FINES, TAXES AND ANY OTHER CHARGES OF ANY KIND OR NATURE WHATSOEVER. THE TERM "GRANTOR'S RELATED PARTIES" SHALL INCLUDE GRANTOR AND ITS AFFILIATES, SUBSIDIARIES, EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS AND THEIR RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS. **GRANTEE WAIVES ALL RIGHTS OR BENEFITS WHICH IT NOW HAS OR IN THE FUTURE MAY HAVE UNDER THE TERMS OF SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH READS:**

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE**

**RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

b) GRANTOR'S RELEASE. GRANTOR, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS. I) **AGREES AND COVENANTS NOT TO SUE** GRANTEE'S RELATED PARTIES (AS DEFINED BELOW) FOR ANY AND ALL CLAIMS (AS DEFINED BELOW),UNLESS SUCH CLAIMS ARISE OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY GRANTEE'S RELATED PARTIES AND II) **AGREES TO ACQUIT, RELEASE AND FOREVER DISCHARGE** GRANTEE'S RELATED PARTIES FROM ANY AND ALL CLAIMS, IN BOTH CASES, THAT ARISE OUT OF OR RELATE TO, IN ANY WAY, THE CONDITION, OWNERSHIP, USE, MAINTENANCE OR OPERATION OF THE PROPERTY AT ANY TIME, WHETHER BEFORE, ON OR AFTER THE DATE ABOVE NO MATTER HOW OR WHEN CAUSED, WHETHER KNOWN OR UNKNOWN, THAT ARE ASSERTED OR MADE BY ANY PERSON OR ENTITY, WHETHER PUBLIC OR PRIVATE, UNDER ANY LAW, UNLESS SUCH CLAIMS ARISE OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY GRANTEE'S RELATED PARTIES AS USED HEREIN, THE TERM "LAW" SHALL MEAN ANY STATUTE, LAW, RULE, REGULATION OR ORDINANCE, WHETHER FEDERAL, STATE OR LOCAL, WHETHER AT LAW OR EQUITY, WHETHER BY STATUTE, COMMON LAW, ADMINISTRATIVE OR REGULATORY PROCEEDING OR OTHERWISE, WHETHER BASED ON THE NEGLIGENCE, STRICT LIABILITY, OR OTHER CONDUCT OF ANY PARTY HERETO OR OTHERWISE, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, THE RESOURCES CONSERVATION AND RECOVERY ACT, THE CLEAN AIR ACT, THE SAFE DRINKING WATER ACT, AND THE CLEAN WATER ACT, OR SIMILAR OR COUNTERPART STATE STATUTES. AS USED HEREIN, THE TERM "CLAIMS" SHALL MEAN ANY AND ALL LOSSES, DAMAGES, CLAIMS, CAUSES OF ACTION, CROSS-CLAIMS, COUNTERCLAIMS, RIGHTS OF CONTRIBUTION OR INDEMNITY, RIGHTS OF REIMBURSEMENT, LIENS, SUITS, LIABILITIES, DEMANDS, PAYMENTS, EXPENSES, COSTS AND FEES, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, ATTORNEYS' AND EXPERT WITNESS FEES, COURT COSTS, CIVIL OR CRIMINAL PENALTIES OR FINES, TAXES AND ANY OTHER CHARGES OF ANY KIND OR NATURE WHATSOEVER. THE TERM "GRANTEE'S RELATED PARTIES" SHALL INCLUDE GRANTEE AND ITS AFFILIATES, SUBSIDIARIES, EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS AND THEIR RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS. **GRANTOR WAIVES ALL RIGHTS OR BENEFITS WHICH IT NOW HAS OR IN THE FUTURE MAY HAVE UNDER THE TERMS OF SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH READS:**

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

6.    ASSUMPTION OF RESPONSIBILITY.  GRANTEE, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, **ASSUMES, UNDERTAKES AND ACCEPTS ANY AND ALL RESPONSIBILITIES, OBLIGATIONS, RISKS AND LIABILITIES**, IF ANY, FOR I) THE ENVIRONMENTAL AND/OR PHYSICAL CONDITION OF THE PROPERTY WHETHER EXISTING, CREATED OR SET IN PLACE BEFORE, ON OR AFTER THE DATE ABOVE, WHETHER KNOWN OR UNKNOWN, NO MATTER HOW OR WHEN CAUSED, WHETHER BASED ON PAST, PRESENT OR FUTURE CONDITIONS, OPERATIONS, ACTIVITIES OR EVENTS, ARISING UNDER OR RELATED TO ANY LAW, AND II) THE ASSESSMENT, REMEDIATION, REMOVAL, TRANSPORTATION, DISPOSAL, TREATMENT OR OTHER DISPOSITION OF ANY AND ALL POLLUTANTS, CONTAMINANTS, WASTES, MATERIALS AND SUBSTANCES IN, ON OR UNDER THE PROPERTY OR WHICH ARE RELATED TO OR ARISING FROM THE PROPERTY AT ANY TIME, WHETHER BEFORE, ON OR AFTER THE DATE ABOVE, WHETHER HAZARDOUS OR NOT, THAT IS OR MAY BE REQUIRED UNDER ANY LAW.

The release and assumption of responsibility obligations, as set forth in paragraphs 5.a. and 7, above, are hereinafter referred collectively as "Grantee Obligations."

TO HAVE AND TO HOLD the Property, subject to the Reservations and Permitted Encumbrances as aforesaid, unto Grantee, and Grantee's successors and assigns, forever; and Grantor does hereby bind Grantor, and Grantor's successors and assigns, to WARRANT and FOREVER DEFEND, all and singular, the Property, subject to the Reservations from and Exceptions to Conveyance and Warranty, unto Grantee, and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.

The parties acknowledge and agree that i) any recitals set forth above are incorporated herein for all purposes, ii) the captions beside the numbered paragraphs of this instrument are for convenience only and will not limit, enlarge, modify, or otherwise affect this Special Warranty Deed, and iii) when the context requires, singular nouns and pronouns include the plural.

This Grant Deed is made effective as of the Date above.

Grantee and Grantor acknowledge and agree that the reservations, covenants, restrictions and obligations contained in the Reservations from and Exceptions to Conveyance and Warranty, and in the Grantee Obligations, as set forth in this Grant Deed:  i) are reasonable in their purpose, ii) touch and concern the Property, iii) shall run with the land making up the Property, and iv) shall be binding on Grantee, and its successors and assigns, forever.

*[Signature pages follow.]*

**Grantor:**

**EXXONMOBIL OIL CORPORATION**

By:_____

    Maria M. Quezada
    Agent and Attorney-in-Fact

STATE OF TEXAS         §
                            §
COUNTY OF HARRIS     §

    This instrument was acknowledged before me on _____, 2019 by Maria M. Quezada, as Agent and Attorney-in-Fact of **EXXONMOBIL OIL CORPORATION**, a New York corporation, on behalf of said corporation.

                _____
                Notary Public, State of Texas

*[Signature pages continue.]*

**Grantee:**

**PC VENICE AND SEPULVEDA LLC**

By:_____

[-----------------------------------]
[-----------------------------------]

STATE OF CALIFORNIA                §
                                   §
COUNTY OF LOS ANGELES              §

    On _____ before me, _____,
Notary Public, personally appeared _____ who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

                                _____
                                Notary Public for the
                                State of California
                                My Commission expires on
                                _____, 2_____

**APPENDIX "A"**
**To GRANT DEED/ENVIRONMENTAL RESTRICTION between**
**ExxonMobil Oil Corporation, as Grantor, and PC Venice and Sepulveda LLC, as**
**Grantee**

### PROPERTY DESCRIPTION

That portion of Lot 15 as shown on map of the 120.71 acre tract, belonging to the Estate of Pedro Talamantes, deceased, in the Rancho La Ballona, in the City of Culver City, County of Los Angeles, State of California, filed in Case No. 7078 of the Superior Court, described as follows:

Beginning at the Point of Intersection of the Southwesterly line of said Lot 15, with the Southeasterly line of the thirty (30) foot strip conveyed to the County of Los Angeles by deed recorded in Book 4224, Page 208 of Deeds, Records of said county; thence South 33°13' East along said Southwesterly line, a distance of One Hundred Thirty (130) feet; Thence North 55°48'30" East, parallel with the Southeasterly line of the Thirty (30) foot strip conveyed to said County of Los Angeles by deed hereinbefore referred to, a distance of One Hundred Fifty (150) feet; Thence North 33°13' West parallel with the Southwesterly line of said Lot 15, a distance of One Hundred Thirty (130) feet to a point in the Southeasterly line of said Thirty (30) foot strip; Thence South 55°48'30" West along said Southeasterly line One Hundred Fifty (150) feet to the Point of Beginning.

Excepting therefrom the Southwesterly Fifty (50) feet thereof included within the line of Sepulveda Boulevard.

APN: 4213-018-014

**EXHIBIT "C"**

To Sale and Purchase Agreement between **EXXONMOBIL OIL CORPORATION**, as Seller, and **PC VENICE AND SEPULVEDA LLC**, as Purchaser.

**NON FOREIGN AFFIDAVIT**
(PURSUANT TO 26 U.S.C. SEC. 1445)

DATE:                    _____, 2019

TRANSFEROR:        EXXONMOBIL OIL CORPORATION, a New York corporation
                             formerly known as Mobil Oil Corporation

TRANSFEROR'S MAILING ADDRESS:
                             22777 Springwoods Village Parkway
                             W3.2B.481
                             Spring, Texas 77389

TRANSFEROR'S U.S. TAXPAYER IDENTIFICATION NUMBER:
                             13-5409005

TRANSFEREE:        PC VENICE AND SEPULVEDA LLC

PROPERTY:           The surface estate of that .30 acre parcel of land, located in Culver
                             City, County of Los Angeles, State of California, said parcel being
                             further described on **Appendix "A"** attached hereto.

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes, including purposes of section 1445, the owner of a disregarded entity that has legal title to a U.S. real property interest under local law will be the transferor of the property and not the disregarded entity. To inform Transferee that withholding of tax is not required on the disposition of a U.S. real property interest by Transferor, I certify on behalf of Transferor that the contents of this affidavit are true.

1.      Transferor is not a foreign corporation (as this term is defined in the Internal Revenue Code and Income Tax Regulations).

2.      Transferor is not a disregarded entity as defined in Treasury Regulation § 1.1445–2(b)(2)(iii).

3.      Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained in this affidavit could be punished by fine, imprisonment, or both.

SJD\ 30853-0002\ 673138.3 7/25/2019

**68**

4.   Transferor understands that Transferee must retain this affidavit and that it may be disclosed to the Internal Revenue Service.

5.   Under penalties of perjury I declare that I have examined this affidavit and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

**TRANSFEROR:**

**EXXONMOBIL OIL CORPORATION**

By:_____

Name:   Maria M. Quezada
            Agent and Attorney-in-Fact

STATE OF TEXAS          §
COUNTY OF HARRIS     §

    Sworn to and subscribed before me on _____, 2019 by Maria M. Quezada, as Agent and Attorney-in-Fact of **EXXONMOBIL OIL CORPORATION**, a New York corporation, on behalf of said corporation.

_____
Notary Public, State of Texas

## APPENDIX "A"

### To NON-FOREIGN AFFIDAVIT between
### ExxonMobil Oil Corporation, as Transferor, and PC Venice and Sepulveda LLC, as Transferee

### PROPERTY DESCRIPTION

That portion of Lot 15 as shown on map of the 120.71 acre tract, belonging to the Estate of Pedro Talamantes, deceased, in the Rancho La Ballona, in the City of Culver City, County of Los Angeles, State of California, filed in Case No. 7078 of the Superior Court, described as follows:

Beginning at the Point of Intersection of the Southwesterly line of said Lot 15, with the Southeasterly line of the thirty (30) foot strip conveyed to the County of Los Angeles by deed recorded in Book 4224, Page 208 of Deeds, Records of said county; thence South 33°13' East along said Southwesterly line, a distance of One Hundred Thirty (130) feet; Thence North 55°48'30" East, parallel with the Southeasterly line of the Thirty (30) foot strip conveyed to said County of Los Angeles by deed hereinbefore referred to, a distance of One Hundred Fifty (150) feet; Thence North 33°13' West parallel with the Southwesterly line of said Lot 15, a distance of One Hundred Thirty (130) feet to a point in the Southeasterly line of said Thirty (30) foot strip; Thence South 55°48'30" West along said Southeasterly line One Hundred Fifty (150) feet to the Point of Beginning.

Excepting therefrom the Southwesterly Fifty (50) feet thereof included within the line of Sepulveda Boulevard.

APN: 4213-018-014

## EXHIBIT "D"

To Sale and Purchase Agreement between **EXXONMOBIL OIL CORPORATION**, as Seller, and **PC VENICE AND SEPULVEDA LLC**, as Purchaser.

### **Purchaser's Redevelopment Plans**

**EXHIBIT "E"**

To Sale and Purchase Agreement between **EXXONMOBIL OIL CORPORATION**, as Seller, and **PC VENICE AND SEPULVEDA LLC**, as Purchaser.

<u>**Akron Transaction – Letter Agreement**</u>

**ExxonMobil**
**Environmental and Property Solutions**
22777 Springwoods Village Parkway
Wellness 3, 2A.342
Spring, Texas 77389

Maria M. Quezada
US Americas South Commercial Manager

**ExxonMobil**

November 1, 2019

Mr. Rahul Paliwal
Pacific Collective
1507 7th Street #201
Santa Monica, CA 90401

**Re:   Surface Fee Property Sale of 4.1109 acres of land in Akron, Summit County, State of Ohio; APN: 6813145**

Dear Mr. Paliwal:

Pursuant to the negotiations between **EXXONMOBIL OIL CORPORATION**, a New York corporation ("Seller") and **PACIFIC COLLECTIVE, LLC**, a Delaware limited liability company, or its assignee ("Purchaser"), the purpose of this letter agreement ("Agreement") is to memorialize the terms and conditions upon which Seller, agrees to sell the Property to Purchaser, as follows:

PROPERTY

Seller will sell and convey, and Purchaser will purchase and pay for the surface fee title to the Property, which is more fully described on the attached **Exhibit "A"**.  Concurrently herewith Seller and Purchaser have executed a Sale and Purchase Agreement with respect to certain real property in Culver City, California ("Culver City Property").

PURCHASE PRICE

The Purchase Price for the Property is Twenty Thousand and 00/100 Dollars ($20,000.00).  The Purchase Price will be paid in cash by Cashier's Check or wire transfer at Closing.

TITLE COMPANY

The title company for this transaction will be First American Title Company, with an address of 1790 Hughes Landing Blvd., Suite 110, The Woodlands, Texas, 77380.  ("Title Company").

CLOSING

The closing of the purchase of the Property (the "Closing") will be on or before November 18, 2019, unless agreed to otherwise in writing by the Parties. The Closing will take place at the offices of the Title Company or by counterpart via mail. The Property will be conveyed by Special Warranty Deed ("Deed") attached hereto as **Exhibit "B"**, subject to those exceptions to title which are approved or deemed to be approved by Purchaser. The Parties agree to execute and deliver to the Title Company any documents that may reasonably be required by Title Company to close on the Property in accordance with this Agreement.

REVIEW PERIOD

For a period commencing upon the full execution of this Agreement ("Effective Date") and expiring fifteen days after the Effective Date (the "Review Period"), Purchaser, and Purchaser's employees, contractors, agents and representatives (collectively "Purchaser's Representatives") at Purchaser's sole risk, cost and expense, may enter the Property to generally inspect and survey the Property and to conduct non-invasive tests and studies including a Phase I environmental assessment of the Property, if desired by Purchaser. Should Purchaser desire to conduct any invasive tests, assessments, survey, investigation or other study of the soil and/or groundwater at the Property which would require breaking the plain of the surface of the Property ("Environmental Testing") during the Review Period, such Environmental Testing will be governed by a separate access and indemnity agreement to be entered into between parties.

SELLER SUPPLIED DOCUMENTS

Prior to the date hereof, ExxonMobil shared certain documents relating to the condition of the Property and title information, including a Title Commitment. A list of documents provided to Purchaser is attached hereto as **Exhibit "C"**. **SELLER DOES NOT REPRESENT OR WARRANT AND HEREBY EXPRESSLY DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AND REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF ANY SUCH DOCUMENT, REPORT OR RECORD, ITS PREPARATION, OR ANY INFORMATION UPON WHICH IT IS BASED.**

SURVEY, TITLE COMMITMENT, CLOSING COSTS, AND TAX PRORATIONS

Prior to the date hereof, Seller has provided a survey and Title Commitment for the Property. Seller will be responsible for the cost of the Owner's Title Policy. Other Closing costs are to be paid by the party customarily responsible for such costs in the jurisdiction where the Property lies.

Property taxes will be prorated as of the date of the Closing. Purchaser is responsible for any "roll-back" taxes that may affect the Property due to post-Closing change in use or zoning. Each party is responsible for its own legal fees and expenses. Purchaser is solely responsible for all transfer or conveyance taxes and assessments on the transfer, including any recording fees, taxes and assessments based on any mortgage placed against the Property by Purchaser. Seller is responsible

for expenses associated with clearing title encumbrances to the Property; provided that Seller is not obligated to clear every encumbrance from title.

PURCHASER'S RELEASE, INDEMNITY, AND ASSUMPTION OF RESPONSIBILITY

At Closing, Purchaser will (a) **release, indemnify and hold harmless** Seller from certain claims, as further provided in the Deed, and (b) **assume and be responsible for** the environmental condition of the Property, as further provided in the Deed.

REPRESENTATIONS AND WARRANTIES

Each party represents and warrants that (a) it has, and will have, full power and authority to perform the terms and conditions of this Agreement and execute all documents which are contemplated by this Agreement, (b) the person signing on its behalf has been duly authorized to do so and his or her signature is valid and binding on such party, and (c) it is not regarded as a "blocked person" on the Treasury Department's Office of Foreign Asset Control's list, issued under 31 Code of Federal Regulations, Section 594 and is not a "foreign person" as defined in Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

The Property is to be sold **"AS IS, WHERE IS, WITH ALL FAULTS"** with no warranties other than warranty of title, and **SELLER HEREBY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR PURPOSE, HABITABILITY, AND SUITABILITY.**

REMEDIES

In the event of Purchaser's default, Seller's sole and exclusive remedy will be to terminate this Agreement.  In the event of Seller's default, Purchaser's sole and exclusive remedies are to (a) terminate this Agreement or (b) seek specific performance by Seller (provided that Seller will not, in any event, be required to cure any uncured title objections as part of specific performance).

CONFIDENTIALITY AGREEMENT

The parties agree that the terms of this Agreement are confidential information and will not be disclosed without the other party's prior written consent, except to each party's authorized agents, representatives, legal counsel, tax, environmental and other consultants having a business related need to know.

COMMISSIONS

Each party covenants, represents, and acknowledges that it did not use any broker to facilitate this Agreement.

GOVERNING LAW; WAIVER OF TRIAL BY JURY

The law of the state in which the Property is situated governs this Agreement, without regard to its choice of laws or conflict of laws principles. The parties **irrevocably consent to the exclusive venue and jurisdiction** of any federal or state court sitting in Summit County, Ohio, in any action arising out of or in any way related to this Agreement, unless local law requires venue to be in the county or parish in which the Property is situated. **SELLER AND PURCHASER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.**

BINDING EFFECT AND ASSIGNMENT

This Agreement will bind and inure to the benefit of the parties and their respective heirs, successors, and permitted assigns; however, this Agreement may not be assigned by Purchaser without Seller's prior written consent, and any approved assignee of Purchaser must assume in writing all of Purchaser's obligations hereunder. Any assignment without Seller's written consent will be void and without effect. In no event will any consent to assignment by Seller or any such assumption by any assignee release or relieve Purchaser from its obligations under this Agreement.

GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

Notwithstanding anything to the contrary in this Agreement, each party (each, a "Responsible Party") bears full responsibility, without limit, for gross negligence and/or willful misconduct attributable to its managerial and/or senior supervisory personnel related to this Agreement and in no event will a party be required to release or indemnify a Responsible Party for gross negligence or willful misconduct attributable to a Responsible Party's managerial and/or senior supervisory personnel arising out of this Agreement. The provision survives the expiration or sooner termination of this Agreement.

NOTICES

All notices must be in writing and delivered to the recipient's address shown beneath its signature herein below.

TIME OF ESSENCE

Time is of the essence to both Seller and Purchaser in connection with this Agreement and the performance of obligations under it.

SURVIVAL

The terms and conditions of this Agreement will survive Closing and will not merge into the Deed.

ENTIRE AGREEMENT

This Agreement and all of its attachments, exhibits and referenced agreements constitute the entire agreement between Seller and Purchaser with regard to the subject matter hereof, and all prior agreements and undertakings, both written and oral, are merged in it.

COUNTERPARTS

This Letter Agreement may be executed in multiple counterparts, each of which will be deemed an original document, but all of which together will constitute a single document.

NOTIFICATION:

*Purchaser acknowledges that neither the submission of this letter or any information concerning the Property for Purchaser's examination, nor discussions or negotiations between the parties constitute an offer to sell, a reservation of, or an option for the Property, and this letter and the underlying transaction will become enforceable and binding between the parties only upon its execution and delivery by the authorized representatives of each party.*

If this Agreement accurately sets forth your understanding of the terms of sale of the Property, then please deliver three fully signed originals of this letter to the Title Company.

If you have any questions regarding this letter, please let me know. We look forward to closing the sale of the Property to you.

Very truly yours,

**EXXONMOBIL OIL CORPORATION**

By:     _____
Name:  Maria M. Quezada
Title:   Agent and Attorney-in-Fact

ADDRESS OF SELLER:

22777 Springwoods Village Parkway
W3.2B.481
Spring, Texas 77389

Page 5 of 21

77

ACKNOWLEDGED AND AGREED
on this 5th day of November , 2019:

"Purchaser":

**PACIFIC COLLECTIVE, LLC**

By: _____
Name: Rahul Paliwal
Title: Managing Director

ADDRESS OF PURCHASER:

1507 7th Street #201
Santa Monica, CA  90401

Page 6 of 21

The Title Company executes this Letter Agreement to acknowledge receipt of the Earnest Money and to evidence its agreement to handle and dispose of the Earnest Money and otherwise to perform the duties of the Title Company in accordance with the terms of this Agreement.

### FIRST AMERICAN TITLE COMPANY

By: _____

Name:  Sharon Mork

Title:   Vice President/Manager

Date:_____, 2019

## Exhibit A

## Legal Description of Property

A certain parcel of land situated in the City of Akron, County of Summit, State of Ohio. Known as being part of Lots 1, 2, 4, 5 and 6 of the "Subdivision of C. Oberholtz Estates in Tract 7 Portage", as recorded in Plat Book 2, Page 43, Summit County Records. Being all of that certain portion of vacated Jewett Street (40' wide) (vacated May 22, 1912, per Akron City Council Ordinance No. 3214) lying North of the South line of said Subdivision of C. Oberholtz Estates in Tract 7 Portage and lying South of the South line of land conveyed to the Wheeling and Lake Erie Railway Company (recording information unavailable). Less and excepting therefrom all of that certain portion of a Public Alley (20' wide) (dedicated February 6, 1922). Said land being all of the same land conveyed from H. Muehlstein & Co. Inc., a Corporation incorporated under the laws of the State of New York, to Mobil Oil Corporation per that certain Warranty Deed dated February 7, 1996, recorded February 9, 1996, in Official Records Book 2108, Page 1125, Summit County Records, and said land being more particularly described as follows:

COMMENCING at a capped rebar stamped "C&A" found at the Northeast corner of land conveyed to Russell Products Co., Inc. (Document No. 56281235, Summit County Records), the same being the Northeast corner of Lot 7, aforesaid Subdivision of C. Oberholtz Estates in Tract 7 Portage, the same also being the intersection of the South line of a Public Alley (20' wide; date and source of dedication are unknown; right-of-way appears to be unimproved; said Public Alley also appears on said Subdivision of C. Oberholtz Estates in Tract 7 Portage) with the West line of aforesaid Public Alley (20' wide) (dedicated February 6, 1922);

Thence South 87°52'13" East, along the North line of Lot 6, Subdivision of C. Oberholtz Estates in Tract 7 Portage and the Northernmost line of said Public Alley (20' wide) (dedicated February 6, 1922), a distance of 20.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set at the Northwest corner of the remainder of said Lot 6, said point also being the true POINT OF BEGINNING for the herein described parcel of land;

Thence South 87°52'13" East, continuing along the North line of Lot 6 and along the South line of said Public Alley (20' wide; date and source of dedication are unknown; right-of-way appears to be unimproved; said Public Alley also appears on said Subdivision of C. Oberholtz Estates in Tract 7 Portage), a distance of 120.01 feet to a drill hole set in concrete at the Northwest corner of Lot 5, said subdivision;

Thence North 87°20'52" East, continuing along the South line of said Public Alley and along the North line of said Lot 5, a distance of 54.49 feet to a 5/8" capped rebar stamped "FINKE 8392" set at a Western corner of aforesaid land of Wheeling and Lake Erie Railway Company;

Thence South 68°58'09" East, departing the South line of said Public Alley and departing the North line of said Lot 5, running through said Lot 5, and with the South line of aforesaid land of Wheeling and Lake Erie Railway Company, a distance of 36.53 feet to a drill hole set in concrete at an angle point therein, said point also being the arc of a curve;

Thence still running through Lot 5 and also through Lot 4, said subdivision, and with the South lines of aforesaid lands of Wheeling and Lake Erie Railway Company, and also running through aforesaid vacated Jewett Street, and along the arc of a non-tangent curve to the left having a radius of 814.49 feet, having

an arc length of 251.89 feet, a central angle of 17°43'09", a chord bearing South 73°15'03" East, and having a chord length of 250.88 feet to a 5/8" capped rebar stamped "FINKE 8392" set on the West line of Lot 2, said subdivision, the same being the East line of said vacated Jewett Street;

Thence South 81°05'47" East, departing the East line of said vacated Jewett Street and continuing along the South line of said land of Wheeling and Lake Erie Railway Company and running through said Lot 2, a distance of 214.44 feet to a 5/8" capped rebar stamped "FINKE 8392" set at an angle point therein;

Thence North 89°16'08" East, continuing along and through the same, a distance of 70.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set on the East line of said Lot 2, the same being the West line of Lot 10, "Viall and Munson's Allotment of Block 20 Brown, Tract 7 Portage Township", as recorded in Plat Book 3, Page 25, Summit County Records, the same being the a West line of land conveyed to said land of Wheeling and Lake Erie Railway Company, said point lying South 00°43'52" East from the Northwest corner of said Lot 10;

Thence South 00°43'52" East, along the East line of Lot 2 and Lot 1, said Subdivision of C. Oberholtz Estates in Tract 7 Portage, the West line of said Lot 10 (the same being the West line of said land of Wheeling and Lake Erie Railway Company), the Western terminus of Lorain Street (50' wide, public), the West line of Lot 11, said Viall and Munson's Allotment of Block 20 Brown, Tract 7 Portage Township (the same being the West line of land conveyed to W. Chaffin (Document No. 54620418, Summit County Records)), passing over a 5/8" rebar found at the intersection of the centerline of said Lorain Street with the Western terminus thereof at a distance of 114.00 feet, passing over a capped rebar stamped "5916" found at the Northeast corner of said Lot 11 at a distance of 139.00 feet, and also passing over a 3/4" iron pipe found on the West line of said Lot 11 at a distance of 186.42 feet, in all a distance of 196.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set at the Southeast corner of said Lot 1, Subdivision of C. Oberholtz Estates in Tract 7 Portage, reference a capped rebar stamped "5618" found North 23°34'59" West a distance of 2.21 feet from said corner;

Thence North 89°45'18" West, along the South line of said Lot 1 and along the North lines of land conveyed to Vernelle McGlumphy, Trustee (Document No. 56238603, Summit County Records), land conveyed to Vernelle McGlumphy, Trustee (Document No. 55978855, Summit County Records), land conveyed to Catherine Laverne Rohn (Document No. 54128592), land conveyed to Scott M. Heckel (Document No. 55150423) and land conveyed to Kelley Properties Inc. (Document No. 54194115, Summit County Records),  a distance of 285.03 feet to a 5/8" capped rebar set at the Southwest corner of the remainder of said Lot 1, the same being the Southeastern most corner of aforesaid Public Alley (20' wide) (dedicated February 6, 1922), the same also being the East line of Jewett Street (40' wide, public);

Thence North 00°10'11" East, along said West line of the remainder Lot 2, the Easternmost line of said Public Alley dedication and also along the East line of said Jewett Street, a distance of 20.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set at the Southeast corner of aforesaid vacated Jewett Street, the same being a Northeastern corner of said Public Alley dedication;

Thence South 89°02'04" West, along the South lines of the remainders of aforesaid Lots 4 and 5, Subdivision of C. Oberholtz Estates in Tract 7 Portage, and with a Northern line of said Public Alley dedication, a distance of 456.89 feet to a 5/8" capped rebar set at the Southwest corner of the remainder of said Lot 5;

Thence North 01°39'32" East, along an Eastern line of said Public Alley dedication and with the West line of the remainder of said Lot 5, a distance of 302.23 feet to the POINT OF BEGINNING.

Containing 179,071 square feet, or 4.1109 acres of land, more or less, as surveyed in December of 2017 by Timothy A. Finke, PS, Ohio Registered Professional Land Surveyor No. 8392, for and on behalf of Avalon Land Surveying LLC, and is subject to all legal highways and easements of record.

The Basis of Bearing for this survey is Grid North of the Ohio State Plane Coordinate System, North Zone (FIPS Zone 3401), on the North American Datum of 1983(2011). GPS Observations were used to establish a bearing of South 01°39'32" West for the East line of land shown hereon as being conveyed to Russell Products Co., Inc., per Document No. 56281235, Summit County Records.

Exhibit "B"

## FORM OF SPECIAL WARRANTY DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER AND YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

Date:                          _____, 2019

Grantor:              **EXXONMOBIL OIL CORPORATION,** a New York corporation

Grantor's Mailing Address:

                         22777 Springwoods Village Parkway
                         Spring, Texas 77389

Grantee:             **PACIFIC COLLECTIVE, LLC,**
                         a Delaware limited liability company

Grantee's Mailing Address:

                         1507 7th Street #201
                         Santa Monica, CA  90401

Consideration:     $10.00  cash and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

Property:            All that certain 4.1109 acres, more or less, tracts or parcels of land, which is further described on **Exhibit A** attached hereto and incorporated herein, together with all improvements, structures, and fixtures, if any, located in, on or under the Property, and all and singular the rights, privileges, hereditaments and appurtenances, if any, inuring to the benefit of the Property including, without limitation, all right, title and interest of Grantor in and to all adjacent streets, alleys, rights-of-way, and easements, if any, benefiting and/or burdening the Property, subject to the Reservations from and Exceptions to Conveyance and Warranty herein.

Reservations from and Exceptions to Conveyance and Warranty:

1.   GRANTEE ACKNOWLEDGES THAT: 1)  THE PROPERTY WAS PREVIOUSLY USED FOR INDUSTRIAL USES, 2) THAT HAZARDOUS SUBSTANCES MAY HAVE BEEN USED AT THE PROPERTY HISTORICALLY AND SPILLED, LEAKED, RELEASED OR OTHERWISE DISCHARGED ONTO, INTO OR UNDER THE PROPERTY AND MAY HAVE IMPACTED THE SOIL AND/OR GROUNDWATER ON, IN OR UNDER THE PROPERTY; AND 3) THAT THERE ARE NUMEROUS TIRES LOCATED ON THE PROPERTY.

2.   Permitted Exceptions.  This Special Warranty Deed is subject to (i) any and all valid and subsisting easements, rights-of-ways, conditions, covenants, restrictions, reservations, exceptions and other encumbrances of record, (ii) all building and land use ordinances, laws, regulations and restrictions by municipal or other governmental authority applicable to the Property, and (iii) any other rights in or encumbrances on the Property which are evident by a physical inspection or survey of the Property.

3.   Taxes.  Taxes and assessments for the current year are prorated as of the Date above, and Grantee assumes the payment of such taxes and assessments after this Date, including, but not limited to, all subsequent assessments for prior years to do a change in ownership or change in land usage or zoning.

4.   Use Restrictions, Institutional Controls and Engineering Controls. To ensure the continued protection of the environment and the health and safety of current and future owners of the Property the following restrictive covenants will be established and run with the land and will be binding on all current and future owners of the Property, and their respective heirs, successors and assigns, lessees, or other occupiers and users of the Property:

   a) The Property may not be used for any "residential" construction, development, use, or purpose, which shall without limitation be interpreted to mean and include a prohibition against use for single or multi-family residences, residences for children, the elderly or the infirm, churches and places of worship, schools, nurseries and other pre-school facilities, nursing or convalescent homes, hospitals, health clinics, or other medical facilities, day care facilities, playgrounds, recreational parks, hotels, motels, bed and breakfasts, parks, and any other "Residential land use" restrictions or limitations set forth or described in any and all building, zoning and land use ordinances, laws, regulations and restrictions by municipal or other governmental authorities applicable to the Property.

   b) No groundwater in or under the surface of the Property may be used for any potable purposes.  The construction or installation of any water supply well,

whether for drinking, human consumption, or any other potable purpose on the Property is prohibited.

c) Grantee, at its sole cost and expense, shall use appropriately engineered impervious vapor barriers or liners designed, constructed and maintained to prevent the migration of hydrocarbon vapors, if any, from the soil to the interior of any structures to be constructed at or on the Property in areas where site conditions dictate that the use of a vapor barrier is appropriate to protect human health.

d) Excavation of the subsurface of the Property for development or construction of underground parking, basements or substructures is prohibited. Excavation of the subsurface of the Property for storage spaces or utility conduits where hydrocarbon vapors may accumulate is prohibited.

e) The Property may not be used for "agricultural" purposes, as such term is defined in all building, zoning and land use ordinances, laws, regulations and restrictions by municipal or other governmental authorities applicable to the Property.

f) The restrictions, prohibitions and limitations contained in immediately preceding subparagraphs "a," "b," "c," "d," and "e," above, are referred to as "Use Restrictions."

g) These Use Restrictions shall run with the land, are binding on Grantor and Grantee and all their successors and assigns, as well as all future occupants and owners of the Property and shall be recognized in, and survive, all subsequent sales, transfers, leases, assignments or other conveyances, in whole or part, of the Property. The Use Restrictions shall be referenced in all deeds or other instruments associated with any subsequent sale, transfer, lease, assignment or other conveyance, in whole or in part, of the Property, and the failure to include the Use Restrictions in any future deeds or instruments shall in no way limit or impair the validity of the Use Restrictions. The Use Restrictions will remain effective and in force permanently unless and until waived in writing by Grantor, in its sole discretion.

5.   "AS-IS" Conveyance.   No Warranties.   AS A MATERIAL PART OF THE CONSIDERATION FOR THIS SPECIAL WARRANTY DEED, GRANTOR AND GRANTEE ACKNOWLEDGE AND AGREE THAT GRANTEE IS TAKING THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS," WITH ANY AND ALL LATENT AND PATENT DEFECTS AND THAT THERE IS NO WARRANTY BY GRANTOR THAT THE PROPERTY HAS A PARTICULAR FINANCIAL VALUE OR IS FIT FOR A PARTICULAR PURPOSE. GRANTEE ACKNOWLEDGES AND STIPULATES THAT GRANTEE IS NOT RELYING ON ANY REPRESENTATION, STATEMENT, AGREEMENT, INDUCEMENT OR OTHER ASSERTION WITH RESPECT TO THE CONDITION OF THE PROPERTY (TO INCLUDE, WITHOUT LIMITATION, THE ENVIRONMENTAL OR PHYSICAL CONDITION) BUT IS RELYING SOLELY ON GRANTEE'S

EXAMINATION OF THE PROPERTY. GRANTEE TAKES THE PROPERTY WITH THE EXPRESS UNDERSTANDING AND STIPULATION THAT, EXCEPT AS SET FORTH HEREIN, <u>THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS BY GRANTOR OF ANY KIND.  GRANTEE'S ACCEPTANCE OF THE PROPERTY IS AT THE SOLE RISK AND LIABILITY OF GRANTEE WITH RESPECT TO I) THE PRESENT STATUS AND CONDITION OF THE PROPERTY AND II) THE SUITABILITY, FITNESS OR ACCEPTABILITY OF THE PROPERTY FOR GRANTOR'S PURPOSES.</u>  FURTHER, GRANTEE ACKNOWLEDGES AND STIPULATES THAT IT HAS HAD ACCESS TO THE PROPERTY TO CONDUCT ITS OWN INVESTIGATION AND ASSESSMENT AND IS WELL AWARE OF THE CONDITION OF THE PROPERTY.

6.   <u>Release and Indemnity.</u>   GRANTEE, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS. I) <u>AGREES AND COVENANTS NOT TO SUE</u> GRANTOR'S RELATED PARTIES (AS DEFINED BELOW) FOR ANY AND ALL CLAIMS (AS DEFINED BELOW), II) <u>AGREES TO ACQUIT, RELEASE AND FOREVER DISCHARGE; AND III) AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS</u> GRANTOR'S RELATED PARTIES FROM ANY AND ALL CLAIMS, THAT ARISE OUT OF OR RELATE TO, IN ANY WAY, THE CONDITION, OWNERSHIP, USE, MAINTENANCE OR OPERATION OF THE PROPERTY AT ANY TIME, WHETHER BEFORE, ON OR AFTER THE DATE ABOVE NO MATTER HOW OR WHEN CAUSED, WHETHER KNOWN OR UNKNOWN, THAT ARE ASSERTED OR MADE BY ANY PERSON OR ENTITY, WHETHER PUBLIC OR PRIVATE, UNDER ANY LAW, EXCEPT TO THE EXTENT ATTRIBUTABLE TO GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF GRANTOR'S RELATED PARTIES.  AS USED HEREIN, THE TERM "<u>LAW</u>" SHALL MEAN ANY STATUTE, LAW, RULE, REGULATION OR ORDINANCE, WHETHER FEDERAL, STATE OR LOCAL, WHETHER AT LAW OR EQUITY, WHETHER BY STATUTE, COMMON LAW, ADMINISTRATIVE OR REGULATORY PROCEEDING OR OTHERWISE, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, THE RESOURCES CONSERVATION AND RECOVERY ACT, THE CLEAN AIR ACT, THE SAFE DRINKING WATER ACT, AND THE CLEAN WATER ACT, OR SIMILAR OR COUNTERPART STATE STATUTES. AS USED HEREIN, THE TERM "<u>CLAIMS</u>" SHALL MEAN ANY AND ALL LOSSES, CLAIMS, DAMAGES, DEMANDS, LIABILITIES, SUITS, CAUSES OF ACTION, CROSS-CLAIMS AND COUNTERCLAIMS; ANY AND ALL RIGHTS OF CONTRIBUTION, SUBROGATION, INDEMNITY AND REIMBURSEMENT; ANY AND ALL LIENS, PAYMENTS, PENALTIES AND FINES (CIVIL OR CRIMINAL) AND TAXES; AND ANY AND ALL EXPENSES, COSTS AND FEES, TO INCLUDE WITHOUT LIMITATION AND BY WAY OF EXAMPLE ONLY, ATTORNEYS' AND EXPERT WITNESS FEES AND COURT COSTS, AND ANY OTHER CHARGES OF ANY KIND OR NATURE WHATSOEVER. THE TERM "<u>GRANTOR'S RELATED PARTIES</u>" SHALL INCLUDE GRANTOR AND ITS AFFILIATES, SUBSIDIARIES, EMPLOYEES, OFFICERS, DIRECTORS AND AGENTS AND THEIR RESPECTIVE REPRESENTATIVES, SUCCESSORS AND ASSIGNS. ANY CLAIMS NOT HEREIN RELEASED OR DISCHARGED BY GRANTEE ARE HEREBY <u>IRREVOCABLY AND WITHOUT RECOURSE ASSIGNED AND TRANSFERRED IN FULL</u> TO GRANTOR.

7.   <u>Assumption of Responsibility.</u>   Grantee, for itself and its successors and assigns, <u>ASSUMES, UNDERTAKE AND ACCEPTS ANY AND ALL RESPONSIBILITIES, OBLIGATIONS, RISKS AND LIABILITIES</u>, if any, for i) the environmental and/or physical condition of the Property whether existing, created or set in place before, on or

after the Date above, whether known or unknown, no matter how or when caused, whether based on past, present or future conditions, operations, activities or events, arising under or related to any Law, and ii) the assessment, remediation, removal, transportation, disposal, treatment or other disposition of any and all pollutants, contaminants, wastes, materials and substances in, on or under the Property or which are related to or arising from the Property at any time, whether before, on or after the Date above, whether hazardous or not, that is or may be required under any Law, and iii) without in any way limiting the breadth or scope of the foregoing subclauses i) and ii), those prior uses and site conditions identified in paragraph 1 above.

The release, indemnity and assumption of responsibility obligations, as set forth in paragraphs 6 and 7 above are hereinafter referred collectively as "Grantee Obligations."

**TO HAVE AND TO HOLD,** all and singular, the Property unto Grantee and Grantee's heirs, successors and assigns forever.

Grantor, for the Consideration and subject to the Reservations from and Exceptions to Conveyance and Warranty, and subject to and conditioned upon Grantee's acceptance and agreement to undertake the Grantee Obligations as set forth above, grants, bargains, sells and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and its successors and assigns forever. Grantor binds Grantor and its successors and assigns to warrant and forever defend title to the Property unto Grantee, Grantee's heirs, successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, subject to the matters stated herein, when the claim is by, through, or under Grantor, but not otherwise.

The parties acknowledge and agree that i) any recitals set forth above are incorporated herein for all purposes, ii) the captions beside the numbered paragraphs of this instrument are for convenience only and will not limit, enlarge, modify, or otherwise affect this Special Warranty Deed, and iii) when the context requires, singular nouns and pronouns include the plural.

Grantee and Grantor acknowledge and agree that the reservations, covenants, restrictions and obligations contained in the Reservations from and Exceptions to Conveyance and Warranty, and in the Grantee Obligations, as set forth in this Special Warranty Deed: i) are reasonable in their purpose, ii) touch and concern the Property, iii) are covenants running with the land making up the Property, and iv) shall be binding on Grantee and its successors and assigns, forever.

For purposes of this Deed, the Effective Date hereof will be the date and time this Deed is executed by both parties ("Effective Date").

*[Signature pages follow.]*

*[Special Warranty Deed signature pages -- 1 of 2]*

**Grantor:**

**EXXONMOBIL OIL CORPORATION,**
a New York corporation

By:_____

Name: Maria M. Quezada
Title:   Agent and Attorney-in-Fact

STATE OF TEXAS           §
                         §
COUNTY OF HARRIS         §

    This instrument was acknowledged before me on _____, 2019, by Maria M. Quezada, as Agent and Attorney-in-Fact of **EXXONMOBIL OIL CORPORATION**, a New York corporation, on behalf of said corporation.

_____
Notary Public, State of Texas

*[Signature pages continue.]*

Page 16 of 21

**88**

*[Special Warranty Deed Signature Pages – 2 of 2]*

**Grantee**:

**PACIFIC COLLECTIVE, LLC,**
a Delaware limited liability company

By:_____
Name: _____
Title: _____

STATE OF CALIFORNIA        §
                                   §
COUNTY OF LOS ANGELES    §

     This instrument was acknowledged before me on this ____ day of _____, 2019, by _____ as _____ of **PACIFIC COLLECTIVE LLC**, a Delaware limited liability company, on behalf of said company.

_____
Notary Public, State of _____

## EXHIBIT A

## PROPERTY DESCRIPTION

A certain parcel of land situated in the City of Akron, County of Summit, State of Ohio. Known as being part of Lots 1, 2, 4, 5 and 6 of the "Subdivision of C. Oberholtz Estates in Tract 7 Portage", as recorded in Plat Book 2, Page 43, Summit County Records. Being all of that certain portion of vacated Jewett Street (40' wide) (vacated May 22, 1912, per Akron City Council Ordinance No. 3214) lying North of the South line of said Subdivision of C. Oberholtz Estates in Tract 7 Portage and lying South of the South line of land conveyed to the Wheeling and Lake Erie Railway Company (recording information unavailable). Less and excepting therefrom all of that certain portion of a Public Alley (20' wide) (dedicated February 6, 1922). Said land being all of the same land conveyed from H. Muehlstein & Co. Inc., a Corporation incorporated under the laws of the State of New York, to Mobil Oil Corporation per that certain Warranty Deed dated February 7, 1996, recorded February 9, 1996, in Official Records Book 2108, Page 1125, Summit County Records, and said land being more particularly described as follows:

COMMENCING at a capped rebar stamped "C&A" found at the Northeast corner of land conveyed to Russell Products Co., Inc. (Document No. 56281235, Summit County Records), the same being the Northeast corner of Lot 7, aforesaid Subdivision of C. Oberholtz Estates in Tract 7 Portage, the same also being the intersection of the South line of a Public Alley (20' wide; date and source of dedication are unknown; right-of-way appears to be unimproved; said Public Alley also appears on said Subdivision of C. Oberholtz Estates in Tract 7 Portage) with the West line of aforesaid Public Alley (20' wide) (dedicated February 6, 1922);

Thence South 87°52'13" East, along the North line of Lot 6, Subdivision of C. Oberholtz Estates in Tract 7 Portage and the Northernmost line of said Public Alley (20' wide) (dedicated February 6, 1922), a distance of 20.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set at the Northwest corner of the remainder of said Lot 6, said point also being the true POINT OF BEGINNING for the herein described parcel of land;

Thence South 87°52'13" East, continuing along the North line of Lot 6 and along the South line of said Public Alley (20' wide; date and source of dedication are unknown; right-of-way appears to be unimproved; said Public Alley also appears on said Subdivision of C. Oberholtz Estates in Tract 7 Portage), a distance of 120.01 feet to a drill hole set in concrete at the Northwest corner of Lot 5, said subdivision;

Thence North 87°20'52" East, continuing along the South line of said Public Alley and along the North line of said Lot 5, a distance of 54.49 feet to a 5/8" capped rebar stamped "FINKE 8392" set at a Western corner of aforesaid land of Wheeling and Lake Erie Railway Company;

Thence South 68°58'09" East, departing the South line of said Public Alley and departing the North line of said Lot 5, running through said Lot 5, and with the South line of aforesaid land of Wheeling and Lake Erie Railway Company, a distance of 36.53 feet to a drill hole set in concrete at an angle point therein, said point also being the arc of a curve;

Thence still running through Lot 5 and also through Lot 4, said subdivision, and with the South lines of aforesaid lands of Wheeling and Lake Erie Railway Company, and also running through aforesaid vacated Jewett Street, and along the arc of a non-tangent curve to the left having a radius of 814.49 feet, having an arc length of 251.89 feet, a central angle of 17°43'09", a chord bearing South 73°15'03" East, and having a chord length of 250.88 feet to a 5/8" capped rebar stamped "FINKE 8392" set on the West line of Lot 2, said subdivision, the same being the East line of said vacated Jewett Street;

Thence South 81°05'47" East, departing the East line of said vacated Jewett Street and continuing along the South line of said land of Wheeling and Lake Erie Railway Company and running through said Lot 2, a distance of 214.44 feet to a 5/8" capped rebar stamped "FINKE 8392" set at an angle point therein;

Thence North 89°16'08" East, continuing along and through the same, a distance of 70.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set on the East line of said Lot 2, the same being the West line of Lot 10, "Viall and Munson's Allotment of Block 20 Brown, Tract 7 Portage Township", as recorded in Plat Book 3, Page 25, Summit County Records, the same being a West line of land conveyed to said land of Wheeling and Lake Erie Railway Company, said point lying South 00°43'52" East from the Northwest corner of said Lot 10;

Thence South 00°43'52" East, along the East line of Lot 2 and Lot 1, said Subdivision of C. Oberholtz Estates in Tract 7 Portage, the West line of said Lot 10 (the same being the West line of said land of Wheeling and Lake Erie Railway Company), the Western terminus of Lorain Street (50' wide, public), the West line of Lot 11, said Viall and Munson's Allotment of Block 20 Brown, Tract 7 Portage Township (the same being the West line of land conveyed to W. Chaffin (Document No. 54620418, Summit County Records)), passing over a 5/8" rebar found at the intersection of the centerline of said Lorain Street with the Western terminus thereof at a distance of 114.00 feet, passing over a capped rebar stamped "5916" found at the Northeast corner of said Lot 11 at a distance of 139.00 feet, and also passing over a 3/4" iron pipe found on the West line of said Lot 11 at a distance of 186.42 feet, in all a distance of 196.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set at the Southeast corner of said Lot 1, Subdivision of C. Oberholtz Estates in Tract 7 Portage, reference a capped rebar stamped "5618" found North 23°34'59" West a distance of 2.21 feet from said corner;

Thence North 89°45'18" West, along the South line of said Lot 1 and along the North lines of land conveyed to Vernelle McGlumphy, Trustee (Document No. 56238603, Summit County Records), land conveyed to Vernelle McGlumphy, Trustee (Document

No. 55978855, Summit County Records), land conveyed to Catherine Laverne Rohn (Document No. 54128592), land conveyed to Scott M. Heckel (Document No. 55150423) and land conveyed to Kelley Properties Inc. (Document No. 54194115, Summit County Records), a distance of 285.03 feet to a 5/8" capped rebar set at the Southwest corner of the remainder of said Lot 1, the same being the Southeastern most corner of aforesaid Public Alley (20' wide) (dedicated February 6, 1922), the same also being the East line of Jewett Street (40' wide, public);

Thence North 00°10'11" East, along said West line of the remainder Lot 2, the Easternmost line of said Public Alley dedication and also along the East line of said Jewett Street, a distance of 20.00 feet to a 5/8" capped rebar stamped "FINKE 8392" set at the Southeast corner of aforesaid vacated Jewett Street, the same being a Northeastern corner of said Public Alley dedication;

Thence South 89°02'04" West, along the South lines of the remainders of aforesaid Lots 4 and 5, Subdivision of C. Oberholtz Estates in Tract 7 Portage, and with a Northern line of said Public Alley dedication, a distance of 456.89 feet to a 5/8" capped rebar set at the Southwest corner of the remainder of said Lot 5;

Thence North 01°39'32" East, along an Eastern line of said Public Alley dedication and with the West line of the remainder of said Lot 5, a distance of 302.23 feet to the POINT OF BEGINNING.

Containing 179,071 square feet, or 4.1109 acres of land, more or less, as surveyed in December of 2017 by Timothy A. Finke, PS, Ohio Registered Professional Land Surveyor No. 8392, for and on behalf of Avalon Land Surveying LLC, and is subject to all legal highways and easements of record.

The Basis of Bearing for this survey is Grid North of the Ohio State Plane Coordinate System, North Zone (FIPS Zone 3401), on the North American Datum of 1983(2011). GPS Observations were used to establish a bearing of South 01°39'32" West for the East line of land shown hereon as being conveyed to Russell Products Co., Inc., per Document No. 56281235, Summit County Records.

**Exhibit "C"**

**Seller Supplied Documents**

| |
|---|
| Environmental: Phase I ESA (November 2009) |
| Environmental: Phase I Appendix - EDR Certified Sanborn Map Report (08/26/2009) |
| Environmental: Phase I Appendix - EDR Aerials (09/02/2009) |
| Environmental: Phase 1 Appendix - City of Akron Building Department Records |
| Environmental: Phase I Appendix – Figure 2 – Jewett Site Plan |
| Environmental: Phase 1 Appendix – XOM Site Photos |
| Commercial Due Diligence Services: Final Survey (03/18/2018) |
| Commercial Due Diligence Services: Survey As Measured Description (03/18/2018) |
| First American Title Company: Title Commitment (Updated: 04/05/2018) |
| Vesting Deed |
| Exceptions 10_859_121 |
| Exceptions 11_1150_592 |
| Exceptions 12_1186_328 |
| Exceptions 13_2540_98 |
| Plat Book 2, Page 43 |

# EXHIBIT 2

# EXHIBIT 2

## FIRST AMENDMENT OF SALE AND PURCHASE AGREEMENT

THIS FIRST AMENDMENT OF SALE AND PURCHASE AGREEMENT ("**Amendment**"). is made as of this 7th day of February 2020 by and between EXXONMOBIL OIL CORPORATION, a New York corporation, formerly known as Mobil Oil Corporation "**Seller**"), and PACIFIC COLLECTIVE, LLC, a Delaware limited liability company ("**Purchaser**") (Seller and Purchaser are sometimes referred herein, collectively, as the "**Parties**"). All initially capitalized terms used herein which are not otherwise defined herein shall have the meanings ascribed to them in the Sale and Purchase Agreement (as such term is defined below).

## RECITALS

A.      Seller and Purchaser have entered into that certain Sale and Purchase Agreement ("**Purchase Agreement**"), dated effective as of February 3, 2020, for the sale of the property described in the Purchase Agreement (collectively, the "**Property**").

B.      The Parties desire to amend the Purchase Agreement to modify the Closing Date and Review Period and clarify Earnest Money Deposit terms in the Purchase Agreement.

## AGREEMENT:

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The Recitals are incorporated herein as if fully stated.

2.      Paragraph 3.A. of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "As of September 28, 2018, pursuant to the Limited Option to Purchase between Seller and Purchaser, dated September 24, 2018, Purchaser deposited with Seller the amount of $50,000.00 ("Option Deposit"), which is nonrefundable, but will be applied towards the Purchase Price at Closing".

3.      Paragraph 3.B. of the Purchase Agreement provides that Earnest Money is to be deposited with the Title Company within 3 business days of the Effective Date, which was February 3, 2020. Notwithstanding anything to the contrary in the Purchase Agreement, the Parties hereby agree that Purchaser's deposit of the Earnest Money by 5:00 pm Pacific Time on February 7, 2020 will be considered timely.

4.      Paragraph 4 of the Purchase Agreement provides that "Closing will occur no later than November 18, 2019." The Effective Date of the Purchase Agreement is February 3, 2020, which is after the prescribed Closing Date. Paragraph 18 of the Purchase Agreement further provides "Time is of the essence to both Seller and Purchaser . . . The parties have agreed that strict compliance by both of them is required as to all dates and time periods set out herein." Given that

time is of the essence, the parties hereby amend the Closing Date to be no later than March 31, 2020.

5.      Paragraph 11 of the Purchase Agreement provides for a Review Period of 90 days, however given the original Closing Date and time being of the essence, the Purchaser hereby agrees to waive the Review Period. Purchaser acknowledges and agrees that it was able to conduct desired due diligence activities prior to the Effective Date.

6.      All capitalized terms in this Amendment will have the meaning set forth in the Purchase Agreement.

7.      Except as expressly amended and modified under this Amendment, the Parties hereby ratify and affirm the terms and provisions of the Purchase Agreement in their entirety.

8.      This Amendment may be executed in counterparts, including facsimile counterparts, each of which will be deemed an original document, but all of which will constitute a single document.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the day and year first above written.


**PURCHASER:**                        **PACIFIC COLLECTIVE, LLC**

                                       By: _____
                                       Name: Rahul Paliwal
                                       Title: Managing Director


**SELLER:**                           **EXXONMOBIL OIL CORPORATION**

                                       By: _____
                                       Name: Maria M. Quezada
                                       Title: Agent and Attorney-in-Fact


Page 2 of 2


**96**

# EXHIBIT 3

# EXHIBIT 3

# Buchalter

1000 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90017
213.891.0700 Phone
213.896.0400 Fax

File Number: P0339-0002
213.891.5029 Direct
ggreen@buchalter.com

March 30, 2020

**VIA FEDEX AND E-MAIL (BRIAN.STEELMAN@EXXONMOBIL.COM;
ANNETTE@MOOREENVIROLAW.COM)**

Brian Steelman
Commercial Portfolio Manager
Exxon Mobil Corporation
22777 Springwoods Village Parkway,
W3.2b.481
Spring, TX 77389

Annette Moore
Counsel
Exxon Mobil Corporation
P.O. Box 812
Kittredge, Colorado 80457

      Re:    SALE AND PURCHASE AGREEMENT (the "Agreement") dated February 3,
2020, by and between EXXONMOBIL OIL CORPORATION, a New York
Corporation f/k/a Mobil Oil Corporation ("Seller") and PACIFIC COLLECTIVE,
LLC, a Delaware limited liability company ("Buyer").

Dear Mr. Steelman and Ms. Moore:

      This firm represents Buyer in connection with the purchase of the property (the
"Property") contemplated by the Agreement. Pursuant to the Agreement, the close of escrow is
currently scheduled for March 31, 2020 (the "Closing").

      Section 38 of the Agreement states:

          "The deadline for performance of any obligation of a party
here under shall be automatically extended one day such
performance is delayed on account of force majeure, which as used
herein means acts of God, strikes, lockouts, sit-downs, material or

buchalter.com

Los Angeles
Napa Valley
Orange County
Portland
Sacramento
San Diego
San Francisco
Scottsdale
Seattle

# Buchalter

Brian Steelman
Annette Moore
March 30, 2020
Page 2

> labor restrictions, earthquakes, fires, storms, acts of the public
> enemy, acts of terrorism, wars, insurrections, defaults by the other
> party and any other cause not reasonably within the control of the
> party whose performance is delayed by force majeure and which,
> by the exercise of due diligence, the claiming party is unable,
> wholly or in part, to prevent or overcome."

The ongoing COVID-19 pandemic is a force majeure that prevents Buyer from meeting its obligations under the Agreement by the Closing. As you are aware, the City of Los Angeles, County of Los Angeles, and State of California each issued "Safer at Home" orders on March 19, 2020. The City of Culver City issued its own "Safer at Home" order on March 20, 2020. Among other restrictions, the "Safer at Home" orders (1) require all persons to remain at least 6 feet away from one another, and (2) close all "Non-Essential Retail Businesses."

While our client fully intends to proceed with its purchase of the Property, the aforementioned orders and restrictions inhibit our client's ability to close escrow while the governmental orders and restrictions remain in force. The "Safer at Home" orders will be in effect until at least April 19, 2020, a minimum period of thirty-one days, unless further extended. Unfortunately, the "Safer at Home" orders are expected to remain in effect for an unknown additional period of time.

Because Buyer is unable to proceed with the Closing while the "Safer at Home" orders remain in effect, we are hereby providing notice on behalf of Buyer that, pursuant to Section 38 of the Agreement, Buyer extends the Closing one day for each day any applicable "Safer at Home" order remains in effect. Accordingly, as of the date of this letter, the Closing can occur no sooner than May 1, 2020.

Respectfully,

BUCHALTER
A Professional Corporation

Gabriel G. Green
Shareholder

GG:dlb

# Buchalter

Brian Steelman
Annette Moore
March 30, 2020
Page 3

cc:    Sharon P. Mork

# EXHIBIT 4

# EXHIBIT 4

Annette M. Moore
Counsel
Moore Environmental Law Group, LLC
P.O. Box 812
Kittredge, CO 80457

T 303-670-3683
annette@mooreenvirolaw.com

March 31, 2020

**VIA ELECTRONIC MAIL**

Pacific Collective, LLC
Attention: Rahul Paliwal
1507 7th Street #201
Santa Monica, California 90401
Email: rp@pacificcollective.com

Mr. Gabriel Green
Buchalter
1000 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90017
Email: ggreen@buchalter.com

**SUBJECT: Sale and Purchase Agreement, dated February 3, 2020 ("Agreement"), by and between ExxonMobil Oil Corporation ("Seller") and Pacific Collective, LLC ("Purchaser"); Response to Purchaser's Notice of delay of closing, dated March 30, 2020.**

Dear Mr. Paliwal and Mr. Green:

Seller is in receipt of Purchaser's Notice of delay of closing, dated March 30, 2020 ("Purchaser's Notice"). In the Notice, Purchaser invokes the Force Majeure clause in Section 18 of the Agreement citing "Safer at Home" orders issued in connection with COVID-19 as a force majeure that prevents Closing from occurring before May 1, 2020.

Purchaser's Notice references the "Safer at Home" Orders issued on March 19, 2020 by the City and County of Los Angeles and the State of California and on March 20, 2020 by the City of Culver City as precluding the Purchaser from fulfilling its obligation under the Agreement to close on March 31, 2020.

Response to Purchaser's Notice
Page 1 of 3

The County of Los Angeles "Safer at Home" Order requires "all businesses to cease in-person operations and close to the public, unless the business is defined as an Essential Business by this Order." The City of Culver City "Safer at Home" order incorporates by reference the City of Los Angeles' "Safer at Home" order, which requires businesses to "cease operations that require in-person attendance by workers at a workplace. . .To the extent that business operations may be maintained by telecommuting or other remote means, while allowing all individuals to maintain shelter in their residences, this order shall not apply to limit such business activities." Both Cities of Culver City and Los Angeles and County of Los Angeles "Safer at Home" Orders further provide that the following are "Essential Businesses" that are exempt from the Orders to cease in-person operations: "Banks, Credit Unions, financial institutions, and insurance companies; and businesses providing mailing and shipping services, including post office boxes". In addition, the County of Los Angeles "Safer at Home" Order includes "the permitting, inspection, construction, transfer and recording of ownership of housing, including residential and commercial real estate and anything incidental thereto." At this time, all of the "Safer at Home" Orders expire on April 19, 2020.

While Purchaser's business is not an "Essential Business" under the "Safer at Home" Orders, it is allowed to continue business operations and the services required to close the transaction are "Essential Businesses" and functional at this time. These are the same circumstances in which Seller is operating, and Seller remains willing and prepared to close this transaction. The Title Company has also confirmed that, at this time, it is able to close the transaction. There are no other conditions to closing that exist in the Agreement that cannot be met.

At this time, the "Safer at Home" Orders do not prevent or prohibit Purchaser's performance of its obligations under the Agreement nor do they prevent or prohibit Closing. Therefore, Seller rejects Purchaser's assertion that it is unable to perform due to a force majeure event and demands Purchaser perform its obligations as stated in the Agreement and First Amendment to Sale and Purchase Agreement.

Throughout the almost two-year timeline of this transaction, including Limited Option to Purchase and amendments thereto, and negotiation, execution and amendment of the Agreement, Seller has acted in good faith and adjusted Earnest Money amounts and extended the Closing Date to accommodate Purchaser's inability to meet Earnest Money amounts and Closing dates. The First Amendment to Sale and Purchase Agreement, dated February 3, 2020, provides for a Closing Date of March 31, 2020. The Agreement further provides that "Time is of the Essence" and all deadlines for obligations are to be strictly observed. If Purchaser cannot close on the transaction as provided in the First Amendment to Sale and Purchase Agreement, Seller will terminate the Agreement as is its right pursuant to the Agreement.

Please contact me should you desire to discuss this matter further.


Regards,


Annette M. Moore


Cc:     File
        B. Steelman, ExxonMobil Environmental and Property Solutions Company
        S. Mork, First American Title Company


Response to Purchaser's Notice
Page 3 of 3

# EXHIBIT 5

# EXHIBIT 5

# Buchalter

1000 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90017
213.891.0700 Phone
213.896.0400 Fax

File Number: P0339-0002
213.891.5029 Direct
ggreen@buchalter.com

April 2, 2020

**VIA FEDEX AND E-MAIL (BRIAN.STEELMAN@EXXONMOBIL.COM; ANNETTE@MOOREENVIROLAW.COM)**

Brian Steelman
Commercial Portfolio Manager
Exxon Mobil Corporation
22777 Springwoods Village Parkway,
W3.2b.481
Spring, TX 77389

Annette Moore
Counsel
Exxon Mobil Corporation
P.O. Box 812
Kittredge, Colorado 80457

> Re:     SALE AND PURCHASE AGREEMENT (the "Agreement") dated February 3, 2020, by and between EXXONMOBIL OIL CORPORATION, a New York Corporation f/k/a Mobil Oil Corporation ("Seller") and PACIFIC COLLECTIVE, LLC, a Delaware limited liability company ("Purchaser"); Response to Seller's letter dated March 31, 2020 ("Seller's Response")

Dear Ms. Moore:

Seller has received the Response to Purchaser's Notice, dated March 31, 2020.  Purchaser reaffirms that a force majeure event is ongoing.  Accordingly, Purchaser properly extended the closing to no sooner than May 1, 2020, as permitted under Section 38 of the Agreement.

The substantial and disruptive impact of the COVID-19 pandemic is not just limited to closure of non-essential businesses, whether non-essential businesses are permitted to carry out their business activities, or the ability of title companies to record deeds and issue title insurance. The COVID-19 pandemic, including but not limited to the "Safer at Home" orders have created a pervasive environment of uncertainty, delay, and disruptive that prevented Purchase from closing

buchalter.com

Los Angeles
Napa Valley
Orange County
Portland
Sacramento
San Diego
San Francisco
Scottsdale
Seattle

Buchalter

Brian Steelman
Annette Moore
April 2, 2020
Page 2

on March 31, 2020 and continues to prevent the Closing from occurring while the COVID-19 pandemic and the specifically referenced "Safer at Home" orders remain in force.

We understand that you are out of state and, thus, may not be aware of the significant impact that the COVID-19 pandemic is causing to California residents, our economy, and our governmental system. Indeed, the day before the targeted March 31, 2020 closing date, the Chief Justice of California's Supreme Court and Chair of the Judicial Council, the Honorable Tani G. Cantil-Sakauye, issued a Statewide Emergency Order significantly limiting almost all of California Courts for a temporary period while the United States deals with this unprecedented pandemic. A copy of the Honorable Judge Cantil-Sakauye's Emergency Order is enclosed for your reference.

As the closing was properly extended pursuant to the terms of the Agreement, the Agreement remains in effect. Seller has no grounds to terminate the Agreement. Seller's threatened improper termination of the Agreement constitutes an anticipatory breach of the Agreement and if Seller attempts to prematurely terminate the Agreement, Purchaser will take whatever legal actions it deems necessary to protect its rights. Seller is on notice of Purchaser's exercise of its right to extend the Closing based on the mutually beneficial force majeure clause that the Purchaser and Seller bargained to include in the Agreement.

Your accusations regarding the parties' interaction over the past two years are inaccurate and not well taken. As your client well knows, Purchaser has earnestly pursued the Closing in good faith throughout its nearly two year relationship with Seller. We note that Purchaser has endured several response lag times of several months as well as further delays due to changes in Seller personnel, which taken together pushed the original scheduled Closing into this force majeure event. If either side is to be faulted for any prior delays in the transaction, it is the Seller that bears the primary blame.

Notwithstanding the foregoing and despite the on-going force majeure issues created by the COVID-19 pandemic, Purchaser remains open to discussing a solution with Seller that will address all parties' concerns while we all deal with this pandemic. I would invite a call among counsel and our respective clients to discuss these issues and a potential solution. Please let me know by 5PM Pacific Time on April 2, 2020 if Seller is willing to engage in further discussions.

Nothing herein is intended to be a complete recitation of Pacific Collective's factual or legal contentions. All rights are reserved, none are waived

**107**

# Buchalter

Brian Steelman
Annette Moore
April 2, 2020
Page 3

Respectfully,

BUCHALTER
A Professional Corporation

Gabriel G. Green
Shareholder

GG:dlb

cc:    Sharon P. Mork

# EXHIBIT 6

# EXHIBIT 6

Annette M. Moore
Counsel
Moore Environmental Law Group, LLC
P.O. Box 812
Kittredge, CO 80457

T 303-670-3683
annette@mooreenvirolaw.com

April 3, 2020

**VIA ELECTRONIC MAIL**

Pacific Collective, LLC
Attention: Rahul Paliwal
1507 7th Street #201
Santa Monica, California 90401
Email: rp@pacificcollective.com

Mr. Gabriel Green
Buchalter
1000 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90017
Email: ggreen@buchalter.com

**SUBJECT: Sale and Purchase Agreement, dated February 3, 2020 ("Agreement"), by and between ExxonMobil Oil Corporation ("Seller") and Pacific Collective, LLC ("Purchaser"), as amended by First Amendment to Sale and Purchase Agreement, dated February 7, 2020; SELLER'S NOTICE OF TERMINATION**

Dear Mr. Paliwal and Mr. Green:

This Notice serves as Seller's termination of the Agreement pursuant to Section 16 of the Agreement. Purchaser failed to meet the obligations of the Agreement and close the transaction on March 31, 2020. Therefore, as is Seller's right under the Agreement, it is terminating the Agreement and retaining the Earnest Money. Upon this Notice of Termination, Seller and Purchaser no longer have any rights or obligations under the Agreement.

Seller understands that Purchaser was unable to close the transaction due to the loss of its tenant and financing. Seller further understands that the tenant withdrew from its lease prior to the "Safer at Home" Orders referenced in Purchaser's Notice and letter.

Seller's Notice of Termination
Page 1 of 2

As communicated in its letter of March 31, 2020, Seller does not accept the "Safer at Home" Orders as a force majeure event under the Agreement as none of these Orders prevented or prohibited the Closing from occurring.

Regards,

Annette M. Moore

Cc:     File
        B. Steelman, ExxonMobil Environmental and Property Solutions Company
        S. Mork, First American Title Company